DECISION.
{¶ 1} Defendant-appellant Carlton James, Jr., killed two men in 2002, one in May and one in September. James now appeals his resulting convictions.
 {¶ 2} A jury found James guilty of two murder counts related to the homicide of Rashad Barnes, of accompanying firearm specifications, and of having a weapon while under a disability. For those offenses, the trial court sentenced James to an aggregate prison term of 23 years to life.
 {¶ 3} James waived his right to a jury trial for the charges related to Tony Johnson's homicide. With the state's agreement, James entered guilty pleas to voluntary manslaughter and having a weapon while under a disability. The trial court sentenced James to ten-year and five-year consecutive prison terms, and ordered the terms to run concurrently with the sentence imposed for the offenses stemming from Barnes's death.
 The Barnes Murder {¶ 4} At about 4:45 a.m. on September 16, 2002, Douglas Davis was working as a middleman for crack dealers Derrick Minor and Rashad Barnes. Davis would stand on the sidewalk as the "front and center guy," so that the dealers could stay out of the view of any passing police officers. If somebody wanted drugs, Davis would take the person to the dealers.
 {¶ 5} Soon, Carlton James drove up to Davis in a car with a red door. A person named Joe was with him. The back seat of the car was full of household items, including a JVC camcorder. Joe asked Davis if he knew anyone who would be interested in buying any of the items.
 {¶ 6} Davis said that Minor and Barnes might like the camcorder. At that time, Barnes walked up and got into James's car, and James drove off. When they returned, Barnes had the camcorder in his hand.
 {¶ 7} Barnes told Davis, "[Y]ou wouldn't believe what I paid for this. * * * I gave him a 40 cent piece for it. * * * How much do you think it's worth?" Davis told Barnes that he thought the camcorder was worth about $800.
 {¶ 8} About 40 minutes later, James drove up again and told Davis to get into his car. James said that he was looking for Barnes because he had to take care of some business with him.
 {¶ 9} Davis directed James to Barnes. When they drove up to Barnes, Davis got out of the car and Barnes got in with James.
 {¶ 10} Then, as Davis stood on a street corner talking with Minor, James and Barnes drove past them. Davis testified that James and Barnes "were in some kind of conversation. * * * They was [sic] back and forth. I don't know if they were arguing but it was back and forth."
 {¶ 11} James had driven about 50 yards away when Davis heard gunshots. Davis testified that he saw James push Barnes out of the car's passenger door and drive away.
 {¶ 12} Barnes crawled to the sidewalk, where he died from gunshot wounds.
 {¶ 13} While the police were processing the crime scene, they learned that Barnes's car was parked nearby. They recovered a JVC camcorder from the car, but found no discernible fingerprints on it.
 {¶ 14} An autopsy revealed that Barnes had been shot twice. Two .25-caliber bullets had entered the left side of Barnes's body: one entered his upper back and ripped through his aorta, while the other entered his lower back and tore through his left kidney. According to a deputy coroner, the bullet that perforated Barnes's aorta actually caused death, while the second bullet wound was potentially lethal. Testing of the two bullets recovered from Barnes's body revealed that they had been fired from the same automatic pistol.
 James: Version One {¶ 15} The police filed murder charges against James, but were unable to find him in the Cincinnati area. Ten months later, on July 21, 2003, James was arrested in Indianapolis, Indiana.
 {¶ 16} On July 22, 2003, Cincinnati Police homicide investigators Michael Drexelius and Rob Heinlein drove to Indianapolis to interview James.
 {¶ 17} At first, James denied that he had been involved in the shooting. He claimed that his car had been stolen but that he had not reported the theft to police. James then claimed that his car had broken down. After several denials, James eventually admitted that he had been involved in Barnes's shooting.
 {¶ 18} James said that he had been trying to sell a camera. James did not know Barnes, but he was dealing with him because Barnes was going to buy the camera. As they sat in the car, James held on his lap a pearl-handled .25 — caliber semiautomatic handgun that he carried for his protection.
 {¶ 19} James told the police that he knew Minor. James said that while he and Barnes sat in his car, he looked in his rear-view mirror and saw Minor approaching. James noticed that Minor had a gun in his hand, and he thought Minor was going to kill him. James believed that he was being set up.
 {¶ 20} James said that as he reached for his gun, he got into a scuffle with Barnes. As they fought, the gun went off two times, and Barnes was shot.
 James: Version Two {¶ 21} At trial, despite his earlier statement to police, James called several witnesses in his defense to establish that he was asleep on the floor of his mother's apartment at the time of the Barnes murder.
 {¶ 22} First, James called Darryl Walker. Walker had seen James at a party throughout the day on September 15, and was "pretty sure" that he saw James sleeping on the floor of his mother's apartment at about 5:30 the next morning, the time of Barnes's murder. But on cross-examination, Walker admitted that the few moments that he had seen James sleeping could have occurred anytime between 3:00 a.m. and sunrise.
 {¶ 23} Walker testified that he remembered September 16, 2002, well because that was the same day that James's brother had suffered a cut to his hand and required hospital treatment.
 {¶ 24} On cross-examination, Walker testified that at 5:30 on Saturday morning, he remembered seeing James sleeping on the floor. When asked if he was aware that September 16, 2002, had fallen on a Monday, and not on a Saturday, Walker admitted that he was not. When asked if he knew where James was on that Monday morning, Walker responded, "Like I said, what makes me only recall, only thing that makes me put the two things together was his brother getting cut. His brother got cut that day, and that was the same incident we're talking about now."
 {¶ 25} Defense witness John Farris testified that he saw James on the day that James's brother had cut his hand. Farris said that he saw James at about 5:30 or 6:00 a.m. on September 16, 2002, just as James was going to sleep.
 {¶ 26} Next, James's brother, Steven Griffin, testified that on September 16, 2002, he had cut his hand at about 1:00 or 2:00 in the morning and had gone to a hospital for treatment. He said that James and his mother picked him up from the hospital at about 9:00 that morning. James was driving a van at that time.
 {¶ 27} Griffin testified that his then-girlfriend's car was a Plymouth Neon with a red door, and he identified a photograph of the car. The same photograph had earlier been identified by Davis as the car James had driven when he shot Barnes.
 {¶ 28} James took the stand in his own defense.
 {¶ 29} James said that on September 16, 2002, at about 1:00 a.m., Griffin was cut and went to the hospital with his girlfriend and Jay Morris. Griffin told a person named Justin to take the girlfriend's car and to pick him up later at the hospital.
At about 2:00 a.m., James said, he went to his mother's apartment and slept. Then at about 4:00 a.m., a person named J.R. knocked on the door and asked where Morris was. James told J.R. to check upstairs. At about 7:00 a.m., J.R. banged on the door and told James that Morris had been driving James's car and had been pulled over by police.
 {¶ 30} James said that later that week, he learned from a news report that the police were seeking information about a white car in connection with Barnes's murder. James testified that his own car was white, and that the police had already impounded it. James said that he had left his car in the impound lot because he knew that Morris had been out stealing radios when he used the car, "[s]o they ain't no telling what they was out there doing."
 {¶ 31} James testified that when the Cincinnati homicide investigators interviewed him, he told them that he had never driven a car with a red door, that he had been home sleeping on September 16, 2002, at 5:30 a.m., and that his car had been stolen that night. But, James testified, the investigators would not listen to him. During a break in the interview, James said, Officer Drexelius beat him up in the bathroom, punched him in the head and body, and injured his finger. Because he was so concerned about further serious injury, James testified, he gave a taped statement to police that implicated himself in Barnes's murder.
 {¶ 32} James testified that he had reported his finger injury upon his arrival at the jail in Cincinnati. He said that the jail nurse had lied when she completed an intake form that indicated he had not complained of an injury.
 {¶ 33} James denied shooting Barnes. But James admitted that he had left Cincinnati for Indianapolis when he learned that the police were looking for him.
 The Alibi Unraveled {¶ 34} In rebuttal, the state presented the testimony of a hospital representative who authenticated medical records for Steven Griffin's emergency-room visit. The visit had occurred on September 13, 2002, three days before Barnes was shot.
 Sufficiency and Weight of the Evidence {¶ 35} In his first, second, and third assignments of error, James challenges the weight and sufficiency of the evidence upon which his murder and weapon-under-disability convictions were based, as well as the trial court's denial of his Crim.R. 29 motions for acquittal.
 {¶ 36} To determine whether a trial court has erred in overruling a Crim.R. 29 motion for acquittal, the question is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt.[1] We make the same inquiry in reviewing the sufficiency of the evidence.[2]
 {¶ 37} In reviewing a challenge to the weight of the evidence, we sit as a "thirteenth juror."[3] We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[4]
 {¶ 38} James was indicted for murder under R.C. 2903.02(A), and for felony murder under R.C. 2903.02(B). To find James guilty of murder, the jury had to find that James had purposely caused the death of Barnes. To find James guilty of felony murder, the jury had to find that Barnes's death had proximately resulted from James's commission or attempted commission of an offense of violence. A conviction for felony murder, with the underlying offense being felonious assault, is predicated upon evidence that the defendant knowingly caused physical harm to the victim.[5]
 {¶ 39} Following our review of the record, we hold that the state presented sufficient evidence of murder. The jury could have reasonably found that James's repeated firing of a loaded gun at close range into Barnes's back evinced a purpose to kill.[6] In view of our conclusion with respect to the murder conviction, it necessarily follows that there was sufficient evidence that James had knowingly caused physical harm with a deadly weapon to justify his felony-murder conviction.[7]
 {¶ 40} As for the weapon-under-disability conviction, James stipulated that he was under disability at the time of the offense, as defined by R.C. 2923.13. Given the state's evidence that James had used an automatic firearm, his conviction for having a weapon while under a disability was supported by sufficient evidence.
 {¶ 41} James argues that he should not have been convicted upon the testimony of Davis, an admitted drug user, especially in light of James's alibi evidence. But the evaluation of the credibility of the witnesses was for the jury. Given James's admission to police that he had shot Barnes in a manner that corroborated Davis's account of the shooting, as well as the utter collapse of James's alibi, this is hardly the "exceptional case in which the evidence weighs heavily against the conviction."[8]
 {¶ 42} Accordingly, we hold that James's convictions were based upon sufficient evidence and were not against the manifest weight of the evidence, and that the trial court properly denied his motions for judgments of acquittal. We overrule the first, second, and third assignments of error.
 The Court Properly Denied James's Motion to Suppress {¶ 43} In his fourth assignment of error, James argues that the trial court should have suppressed his statements to police because the statements were obtained in violation of Miranda v.Arizona.[9] James claims that he had been denied his right to counsel and that he had been physically threatened by police.
 {¶ 44} In determining whether a pretrial statement was involuntarily made, a trial court must consider the totality of the circumstances, "including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."[10] The same considerations apply to whether James understood and voluntarily waived his Miranda
rights.[11]
 {¶ 45} At the suppression hearing, Officer Drexelius testified that he and Officer Heinlein had interviewed James. James told the officers had he had completed the eleventh grade, that he could read and write, and that he was not under the influence of alcohol or drugs. James said that he had asthma and a sinus allergy, but that he did not require medication for either at the time. Drexelius told James that they could not make him any promises or deals.
 {¶ 46} Drexelius advised James of his Miranda rights by reading to him from a notification-of-rights form. James indicated that he understood his rights, agreed to waive his rights, and signed the waiver.
 {¶ 47} Following the waiver, Drexelius began questioning James about Barnes's murder. Initially, the interview was not tape-recorded. But following James's agreement, the officers began to tape-record the interview. At one point during the taped portion of the interview, James reaffirmed that he had been advised of his Miranda rights and that he had agreed to the interview.
 {¶ 48} Then the officers took a short break before questioning James about the murder of Tony Johnson. Again the officers reminded James of his Miranda rights, and James confirmed the advisement.
 {¶ 49} At no time did James halt the questioning or request an attorney. James was escorted to the restroom two times. Drexelius did not recall whether he had escorted James to the restroom for the first trip. During James's second trip to the restroom, Drexelius accompanied him. Before allowing James to go into the restroom, Drexelius looked inside. Drexelius allowed James to go into the restroom but not to shut the door completely. Drexelius waited outside the door. Drexelius noticed no change in James's demeanor or appearance following either restroom trip.
 {¶ 50} Drexelius testified that neither he nor Heinlein had threatened James or had had physical contact with him. Drexelius testified that no complaints stemming from James's arrest had been lodged against him. Drexelius testified that there had been no animosity between himself and James, and that the two men had referred to each other by their first names.
 {¶ 51} At the suppression hearing, James testified that he had requested an attorney as soon as he met with the officers. According to James, Drexelius told him that he would not get an attorney until he got back to Cincinnati. James said that the officers did not advise him of his Miranda rights. He said that he signed two or three documents a few hours into the interview.
 {¶ 52} James testified that when Drexelius escorted him to the restroom, James told him that he did not want to talk to him until he got an attorney. James said that Drexelius entered the restroom, slammed him into the wall, and punched him repeatedly. Drexelius threatened to spray Mace on James if he did not say what he wanted him to say. James testified that he was scared because he did not know what was going to happen, and that Drexelius continued to threaten him. Drexelius escorted him to the bathroom again and told James what he wanted him to say.
 {¶ 53} James estimated that he had requested an attorney three or four times. James said that his taped statements were not voluntarily made because he was scared that he was going to be beaten again.
 {¶ 54} In a suppression hearing, the trial court is in the best position to decide the facts and to evaluate the credibility of the witnesses.[12] Here, the trial court found Drexelius's testimony to be more credible than that of James. The court concluded that James had been properly advised of hisMiranda rights, and that he had knowingly, intelligently, and voluntarily waived his rights. The court further determined that James's statements to police were voluntary.
 {¶ 55} We hold that the record supports the trial court's conclusions, and that the trial court properly denied James's motion to suppress. We overrule the fourth assignment of error.
 No Batson Violation During Jury Selection {¶ 56} In his fifth assignment of error, James argues that the trial court erred by allowing the state to peremptorily challenge three African-American jurors despite his objections made pursuant to Batson v. Kentucky.[13]
 {¶ 57} A defendant's Batson challenge to a peremptory strike prompts a three-step inquiry.[14] First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race.[15] Second, if the defendant has made a prima facie showing, the burden shifts to the prosecutor to present a race-neutral explanation for the challenge.[16]
Then, the court must determine whether the defendant has carried his burden of proving purposeful discrimination.[17] A trial court's findings of no discriminatory intent will not be reversed on appeal unless they are clearly erroneous.[18]
 {¶ 58} In this case, the prosecutors exercised their first peremptory challenge against prospective juror West, an African-American. The prosecutors noted that West had refused to raise his right hand or to verbalize a response when the prospective jurors were being sworn. During voir dire, West indicated that he had a scheduling conflict, but then told counsel not to worry about it. At one point, West asked counsel where the jury questionnaires had come from and who had completed them. In explaining their challenge, the prosecutors said that West seemed concerned that people knew things about him. They said that West seemed not to trust them or defense counsel, and that they felt uncomfortable with him.
 {¶ 59} In support of their challenge to a second African-American, prospective juror White, the prosecutors presented several explanations. First, the prosecutors pointed out that the start of the trial had been initially delayed, due in part to White's difficulty in completing a juror questionnaire. None of the other prospective jurors had had similar difficulty. Second, White was 79 years old and was "barely staying awake" during voir dire, so the prosecutors were concerned that he would be unable to remain awake and attentive throughout the proceedings.
 {¶ 60} In exercising their final peremptory strike, the prosecutors challenged prospective juror Lawson, an African-American. During voir dire, Lawson had indicated that he and prospective juror Jackson had worked together for the same employer for a number of years. One of the prosecutors explained that he was not comfortable having people on a jury that had worked together or socialized together for a long period of time because, as he stated, "I don't think they constitute a jury with independent people." The prosecutor noted that when he directed a question to Lawson, Jackson had responded instead, thereby confirming the prosecutor's concern that the two former co-workers would not maintain the "independent voice[s]" necessary for full and fair deliberations.
 {¶ 61} The trial court accepted the prosecutors' race-neutral explanations for the challenges and concluded that James had not demonstrated that the challenges were racially motivated. We give great deference to the trial court's findings with respect to the prosecutors' lack of discriminatory intent.[19] Because the trial court had the opportunity to observe the demeanor of the attorneys who exercised the challenges, it was in a better position to evaluate the attorneys' credibility.[20] We find no abuse of discretion by the trial court in allowing the state to exercise its peremptory challenges against prospective jurors West, White, and Lawson.[21]
 {¶ 62} Consequently, we overrule the fifth assignment of error.
 Defense Counsel Was Not Ineffective {¶ 63} In his sixth assignment of error, James argues that he was denied the effective assistance of counsel because he had entered guilty pleas with agreed sentences to two offenses stemming from Tony Johnson's homicide. James contends that counsel should have advised him to plead no contest rather than guilty since guilty pleas with agreed sentences would foreclose his rights to appeal the trial court's denial of his suppression motion as well as his sentences for the offenses.
 {¶ 64} The two-part test enunciated in Strickland v.Washington[22] applies to challenges to guilty pleas based on the ineffective assistance of counsel.[23] First, the defendant must show that counsel's performance was deficient.[24] Second, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial.[25]
 {¶ 65} Our review of the record convinces us that counsel's advice with respect to the guilty pleas was not deficient. In connection with the death of Tony Johnson, James was charged with murder and an accompanying firearm specification, carrying a concealed weapon, and having a weapon while under a disability. James faced a mandatory prison term of 15 years to life for Johnson's murder and a mandatory, consecutive three-year prison term for the specification. In addition, James faced eighteen-month and five-year prison terms for the weapons offenses. All told, for the offenses connected to Johnson's murder, James faced 24 1/2 years to life in prison.
 {¶ 66} In exchange for James's guilty pleas, the state agreed to reduce the murder charge to a charge of voluntary manslaughter, thus eliminating the possibility of a second life sentence. The state agreed to dismiss the specification and the concealed-weapon charge. The state further agreed to jointly recommend an aggregate fifteen-year prison term to run concurrently with the life term imposed in connection with Barnes's murder.
 {¶ 67} Nothing in the record supports James's assumption that the state would have agreed to these reductions in exchange for no-contest pleas rather than guilty pleas. James's guilty pleas resulted in concurrent sentences for two different homicides. Given such a favorable outcome for James, we decline to conclude that counsel's performance was deficient.
 {¶ 68} Moreover, even assuming counsel's advice was deficient, James has failed to demonstrate that he would not have otherwise entered guilty pleas. Prior to accepting the pleas, the trial court engaged in a lengthy dialogue with James to ensure that his pleas were made knowingly and voluntarily, pursuant to Crim.R. 11(C).
 {¶ 69} Because James has failed to demonstrate the deficiency of counsel's performance or resulting prejudice, we overrule his sixth assignment of error.
 Foster Requires Resentencing {¶ 70} In his seventh assignment of error, James argues that the trial court erred in sentencing him for the weapon-under-disability offense that stemmed from the Barnes murder. Specifically, James argues that the imposition of a maximum, consecutive term violated his Sixth Amendment right to a jury trial as set forth by the United States Supreme Court inBlakely v. Washington.[26] This assignment of error is well taken in light of the Ohio Supreme Court's recent decision in State v. Foster.[27]
 {¶ 71} Foster dictates that because the sentence was based on unconstitutional statutory provisions, we must sustain the assignment of error, vacate the sentence for the weapon-under-disability offense, and remand the case for resentencing on that offense.[28]
 {¶ 72} In James's eighth assignment of error, he argues that the trial court's imposition of maximum, consecutive sentences was not supported by the record. This assignment of error is rendered moot by our disposition of the seventh assignment of error, so we decline to address it.
 Proper Impeachment {¶ 73} In his ninth assignment of error, James argues that the trial court erred by allowing the state to cross-examine him about carrying a gun.
 {¶ 74} In general, cross-examination is "permitted on all relevant matters and matters affecting credibility."[29]
The scope of cross-examination lies within the sound discretion of the trial court.[30]
 {¶ 75} Here, there were inconsistencies in James's testimony with respect to his possession of a gun, so that testimony was properly subject to cross-examination for impeachment purposes. Finding no abuse of discretion by the trial court, we overrule the ninth assignment of error.
 Conclusion
We sustain James's seventh assignment of error and overrule the remaining assignments of error. We affirm the trial court's judgment except with respect to James's sentence for the weapon-under-disability offense stemming from Barnes's murder. We vacate that sentence and remand the cause for resentencing on that one offense.
Judgment accordingly.
Doan, P.J., and Sundermann, J., concur.
[1] See State v. Bridgeman (1978), 55 Ohio St.2d 261,381 N.E.2d 184, syllabus.
[2] See State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus.
[3] See State v. Thompkins (1997), 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.
[4] Id.
[5] State v. Miller, 96 Ohio St.3d 384, 2002-Ohio-4931,775 N.E.2d 498, syllabus.
[6] See State v. Conway, 108 Ohio St.3d 214, 2006-Ohio-791,842 N.E.2d 996, at ¶ 136.
[7] See Miller, supra, at ¶ 32.
[8] See Thompkins, supra, at 387, citing State v. Martin
(1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.
[9] (1966), 384 U.S. 436, 86 S.Ct. 1602.
[10] State v. Edwards (1976), 49 Ohio St.2d 31,358 N.E.2d 1051, paragraph two of the syllabus.
[11] See State v. Green, 90 Ohio St.3d 352, 366, 2000-Ohio-182, 738 N.E.2d 1208.
[12] State v. Mills (1992), 62 Ohio St.3d 357, 366,582 N.E.2d 972.
[13] (1986), 476 U.S. 79, 106 S.Ct. 1712.
[14] Id.
[15] Id. at 96-97, 106 S.Ct. 1712.
[16] Id. at 97-98, 106 S.Ct. 1712.
[17] Id. at 98, 106 S.Ct. 1712.
[18] See State v. Hernandez (1992), 63 Ohio St.3d 577, 583,589 N.E.2d 1310, following Hernandez v. New York (1991),500 U.S. 352, 111 S.Ct. 1859.
[19] See State v. Gowdy, 88 Ohio St.3d 387, 393-394, 2000-Ohio-355, 727 N.E.2d 579, citing Hernandez v. New York,
supra, at 365, 111 S.Ct. 1859.
[20] Id.
[21] Id.
[22] (1986), 466 U.S. 668, 104 S.Ct. 2052.
[23] Hill v. Lockhart (1985), 474 U.S. 52, 106 S.Ct. 366;State v. Xie (1992), 62 Ohio St.3d 521, 584 N.E.2d 715.
[24] Strickland, 466 U.S. at 687, 104 S.Ct. 2052; Hill,
supra, 474 U.S. at 57, 106 S.Ct. 366; Xie, supra, at 524,584 N.E.2d 715.
[25] Hill, supra, 474 U.S. at 59, 106 S.Ct. 366; Xie,
supra, at 524, 584 N.E.2d 715.
[26] (2004), 542 U.S. 296, 124 S.Ct. 2531.
[27] ___ Ohio St.3d ___, 2006-Ohio-856, 845 N.E.2d 470, paragraphs one, two, three, four, and seven of the syllabus.
[28] See id. at ¶ 103 and 104.
[29] Evid.R. 611(B).
[30] See State v. Acre (1983), 6 Ohio St.3d 140, 145,451 N.E.2d 802.