[This decision has been published in *Ohio Official Reports* at 96 Ohio St.3d 384.]

THE STATE OF OHIO, APPELLANT, *v.* MILLER, APPELLEE.

[Cite as *State v. Miller*, 2002-Ohio-4931.]

*Criminal law—Felony murder—R.C. 2903.02(B), construed and applied.*

(No. 2001-1481—Submitted June 5, 2002—Decided October 2, 2002.)

APPEAL from the Court of Appeals for Ashtabula County, No. 99-A-0078.

———————————

SYLLABUS OF THE COURT

Felony murder as defined in R.C. 2903.02(B), with the underlying offense of violence being felonious assault, is supported by evidence that establishes that the defendant knowingly caused physical harm to the victim.

———————————

LUNDBERG STRATTON, J.

{¶1} On October 7, 1998, the Ashtabula County Grand Jury indicted Jeffrey Miller, defendant-appellee, on charges of aggravated murder in violation of R.C. 2903.01(A) and felony murder in violation of R.C. 2903.02(B). Both counts carried firearm specifications. The charges were in connection with the shooting death of defendant's wife, Lisa.

{¶2} On September 4, 1998, Jeffrey Miller, defendant-appellee, stayed home while his wife, Lisa, went to work. Defendant spoke briefly with his neighbor, Ed Capp, and mentioned that a couple of checks were missing and that he had asked Lisa about them earlier. Defendant told Capp that he planned to go over to his uncle's property that afternoon to go shooting.

{¶3} Defendant arrived at his uncle Allen Massena's home around 12:30 p.m. and they left to look at a truck that defendant was considering purchasing. After being unable to find the truck, the two men returned to Massena's home to target practice. Defendant and Massena shot defendant's .357 Magnum. After the

two finished target practice, defendant unloaded the gun, put the gun back into the holster, placed the remaining unfired ammunition in the back of his truck, and put the unloaded .357 in a separate place in his truck.

{¶4} Around 4:00 p.m., Capp observed defendant sitting on his sun porch and went over to invite him to join him in an area of Ashtabula that includes several bars. Defendant declined, stating that he was going to wait for Lisa to come home.

{¶5} Later that night, around 9:00 p.m., defendant went to the Iroquois Lounge and found Capp. Capp noticed that defendant had been drinking prior to entering the Iroquois. Capp bought defendant a beer, and the two men drank a shot. Defendant told Capp that Lisa did not come home and that he had left her a note stating that he was going to leave her. Defendant asked Capp if he would come over to his home and "get his hardware." Capp understood this to mean that defendant wanted Capp to help him remove his guns from his home. The two men left the bar in separate cars and met back at defendant's home.

{¶6} After defendant and Capp tried unsuccessfully to light a bonfire, the two men entered defendant's house, and Capp sat down at the kitchen table while defendant went upstairs to bring down his guns. While Capp was seated at the kitchen table, he read a note that defendant had left there for Lisa. Capp testified that defendant stated in the note that he was leaving Lisa and that her crafts, her gambling, and her interests meant more than their marriage. According to Capp, defendant stated in the note that he was leaving to "pursue other interests or avenues." The note also indicated that defendant did not think that Lisa's work schedule, which included working weekends, was necessary.

{¶7} Defendant came back downstairs carrying a .357 Magnum revolver in a holster. Capp told defendant that he did not want to bring defendant's guns into his own home unless they were unloaded. Defendant unloaded the .357 Magnum revolver and handed the gun to Capp. Capp took the revolver and checked to be certain that there were no bullets in the gun and then placed the gun back into its

holster. Capp handed the gun back to defendant, who placed it on the kitchen table before going upstairs to retrieve his other guns.

{¶8} Defendant returned with two shotguns that were both loaded. Capp watched as defendant unloaded the rifles and returned upstairs. Capp walked over to the stairs and saw defendant at the top of the stairs holding an ammunition box when Capp heard the sound of the automatic garage door opening.

{¶9} Capp said, "Lisa's home," and he went back into the kitchen and picked up the revolver and the two shotguns. As Capp was leaving, he dropped one of the shotguns. Defendant told Capp, "Never mind. Leave them." Capp left without the guns.

{¶10} Lisa's daughter-in-law, Karen Garside, later testified that she received a telephone call from the defendant at approximately 10:00 p.m. Defendant asked to speak to Karen's husband, Scott, Lisa's son. Karen informed defendant that Scott was not at home. Karen testified that defendant told her that he was looking for Lisa and wondered whether she knew where she was or whether she was with Scott. Karen told defendant that she did not know, and defendant asked Karen to have Scott call him when he returned. Defendant told Karen he was coming over to her home, but Karen asked him not to. Karen testified that defendant sounded drunk and upset.

{¶11} Karen testified that she received another call from defendant around 10:20 p.m. in which he informed her that Lisa had returned, and he asked whether Scott had returned as well. Karen informed defendant that Scott had not returned, and defendant asked again that Karen have Scott call him when Scott returned. Karen again agreed to do so. Karen testified that she could hear Lisa in the background during this telephone call. Karen also testified that the tone of defendant's voice would stagger; he would be irritated one moment, anxious and worried the next, and she could tell once again that he had been drinking.

**{¶12}** Melissa Garside, Lisa's daughter, testified that on September 4, 1998, she and Lisa had planned to meet at Lisa's home at 9:00 p.m. so Melissa could pick up a bed. Melissa called her mother's house at 8:55 p.m. to tell her that she was running late but received no answer, and the answering machine did not activate. Melissa tried again unsuccessfully to call her mother at 9:30 p.m. and 10:00 p.m. At approximately 10:20 p.m., Melissa reached her mother on the phone. Lisa informed her daughter that her husband, defendant, was "drunk off his ass and he's playing with all his guns." Immediately after that, defendant got on the phone and told Melissa, "Your mother is busy right now. You'll have to talk to her later." Defendant then hung up on Melissa.

**{¶13}** Jason White, the Millers' other next-door neighbor, observed Lisa pull into her driveway and park in the garage. White heard the car door close and then heard defendant, who sounded angry, state, "If you don't shut up bitch, I'll kill you." White testified that an hour later, he heard a gunshot. He testified that he did not attempt to call 911 because he often heard gunshots coming from the Miller residence. White also testified that defendant drank a lot and had a beer in his hand every time White saw him.

**{¶14}** Kimberly Cook, a dispatcher for the Ashtabula County Sheriff's Department, testified that defendant made two calls that night regarding an incident at his home. Defendant made the first call at 10:28 p.m. and claimed that the shooting was an accident. The second call was received at 10:30 p.m. Both calls were recorded by the 911 recording equipment and both calls were played for the jury.

**{¶15}** Officer Ronald Kaydo of the Ashtabula Police Department was the first to arrive at the scene. Officer Kaydo testified that the revolver was lying on the kitchen table, about three feet from Lisa's body. He also observed a holster lying on the floor. Officer Kaydo testified that the holster had some damage to the end of it. Officer Kaydo observed Lisa slumped over the table and defendant with

his left hand on the back of Lisa's neck, who stated that he was trying to stop the bleeding. Defendant said that "it was an accident, that he accidentally shot her." Officers conducted a safety sweep of the house. In the upstairs bedroom they found a large ammunition box, ammunition, and shotguns.

{¶16} Richard Turbok, a firearms examiner with the Ohio Bureau of Criminal Identification and Investigation, testified that to a reasonable degree of certainty, the bullet found lodged in the wall stud of the kitchen in the Miller home was fired from defendant's .357 Magnum revolver. Turbok also testified as to the amount of force necessary to pull the trigger of the .357 Magnum revolver to make it fire. Turbok explained that the revolver could be discharged in single action or double action mode. He testified that the amount of weight it takes for the trigger to be pulled to fire the weapon was 6 pounds when the gun was in single action mode and 12½ pounds of pressure when the gun was in double action mode. Dr. Robert Challener, the Chief Deputy Coroner in Cleveland, performed the autopsy on Lisa Miller and determined that she had bled to death from having been shot once in the face from a distance of approximately 18 inches.

{¶17} Defendant was indicted on charges of aggravated murder with a firearm specification in violation of R.C. 2903.01(A), and felony murder with a firearm specification in violation of R.C. 2903.02(B). A jury returned a verdict finding defendant not guilty of aggravated murder but guilty of murder while committing an offense of violence (felonious assault) and found that defendant had had a firearm while committing the offense of violence and had used it to facilitate the offense of murder while committing that offense. Defendant was sentenced to serve fifteen years to life in prison for felony murder and three years for the firearm specification with the two sentences to run consecutively.

{¶18} In a split decision, the Ashtabula Court of Appeals reversed the judgment of the trial court and remanded the matter to the trial court for a new trial. The court of appeals held that because defendant had shot the victim in a vital

portion of her body at a close range, the act had to be either intentional or accidental. Therefore, defendant could not have committed the underlying offense of felonious assault as a matter of law. Further, the court of appeals held that a statement made by the victim to a coworker was inadmissible hearsay.

**{¶19}** The matter is now before this court upon the allowance of a motion for a discretionary appeal.

**{¶20}** Today, this court must decide three issues: whether felony murder as defined in R.C. 2903.02(B) is supported by evidence that establishes that the defendant shot the victim knowingly when the underlying offense of violence charged is felonious assault; whether the unanimous concurrence of all three appellate judges was necessary for a reversal of the judgment in this case pursuant to Section 3(B)(3), Article IV, Ohio Constitution; and whether witness testimony that demonstrates a declarant's then-existing state of mind is properly admitted when the testimony does not offer reasoning for the particular state of mind.

### Felony Murder

**{¶21}** The newly enacted felony murder statute, R.C. 2903.02, became effective on June 30, 1998, well before the crimes occurred in this case. It provides:

**{¶22}** "(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."

**{¶23}** The underlying offense of violence for which defendant was charged in this case was felonious assault. Felonious assault, a second degree felony, is defined by R.C. 2903.11:

**{¶24}** "(A) No person shall *knowingly* * * * :

**{¶25}** "* * *

**{¶26}** "(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance." (Emphasis added.)

**{¶27}** R.C. 2901.22 defines the culpable mental states in Ohio and provides:

**{¶28}** "(B) A person acts *knowingly*, *regardless of his purpose*, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." (Emphasis added.)

**{¶29}** The court of appeals appeared to have been troubled by the fact that the state charged the defendant with two crimes, thereby providing alternate theories of what occurred on September 4, 1998. "From the beginning, it was the state's contention that appellant intentionally shot his wife in the head. The defense, however, argued that the shooting was accidental. Clearly, one of those two choices represents the truth. Either appellant intended to shoot his wife, or it was accidental. If it was intentional, then appellant committed either aggravated murder or murder, depending on whether there was prior calculation and design. If it was unintentional, *i.e.,* the gun was accidentally discharged while appellant was holding it or waiving it around, then such conduct would constitute negligent homicide. In either event, it was not a felonious assault."

**{¶30}** The state readily acknowledges that it attempted to prove at trial that defendant purposely shot his wife. In fact, the state attempted to prove that defendant purposely shot his wife with prior calculation and design: aggravated murder. However, the prosecution is entitled to offer differing theories as to what actually transpired in the commission of an offense and is therefore entitled to use its discretion in deciding which charges to level against the defendant. See *State ex rel. Nagle v. Olin* (1980), 64 Ohio St.2d 341, 347, 18 O.O.3d 503, 415 N.E.2d 279. In this case, the prosecution believed that the facts could support a conviction for either aggravated murder (a purposeful killing with prior calculation and design) or felony murder (a killing as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second

degree, e.g., felonious assault). It was the jury's duty to assess which charge, if any, was supported by the facts presented.

{¶31} In reversing the felony murder conviction, the court of appeals critically misconstrued the standard of mens rea necessary to commit felony murder. Felonious assault is defined as *knowingly* causing, or attempting to cause, physical harm to another by means of a deadly weapon. R.C. 2903.11(A). A person acts *knowingly*, *regardless of purpose*, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist. R.C. 2901.22(B).

{¶32} The jury could certainly find that when the defendant placed a loaded gun within eighteen inches of his wife's head and shot it at her with such aim that he shot her in the cheek, he was aware that his conduct would probably cause a certain result, i.e., harm to his wife. The jury could reasonably believe that in an effort to injure his wife, defendant aimed the gun at a nonvital organ in an attempt to injure only, and one of them moved suddenly. The jury could reasonably believe that the shooting was not an accident. If the jury did not believe that the defendant intended to cause his wife's death, the evidence clearly supported the jury's conclusion that the defendant knew that physical harm to his wife was probable. The evidence was sufficient to support a conviction for felony murder based on felonious assault.

{¶33} If defendant knowingly caused physical harm to his wife by firing the gun at her through a holster at close range, he is guilty of felonious assault. The fact that she died from her injuries makes him guilty of felony murder, regardless of his purpose.

{¶34} The defendant contends that since felony murder has a lesser mens rea standard (knowingly) than murder (purposely), and since the two crimes carry the same punishment, prosecutors will now seek murder convictions under the

felony murder statute based on felonious assault. However, prosecutors can still charge in the alternative and generally seek an indictment most aligned with the facts of the case. In addition, the General Assembly has chosen to define felony murder in this manner, and the General Assembly is presumed to know the consequences of its legislation.

### Section 3(B)(3), Article IV, Ohio Constitution

{¶35} Section 3(B)(3), Article IV, of the Ohio Constitution provides:

{¶36} "A majority of the judges hearing the cause shall be necessary to render a judgment. * * * No judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause."

{¶37} The state argues that the decision of the court of appeals must be reversed, in part because the decision was based on the manifest weight of the evidence and was supported by only two of the three judges on the appellate panel. The defendant, on the other hand, contends that the decision to reverse was based on the sufficiency of the evidence rather than the manifest weight.

{¶38} This court recently clarified that the legal concepts of "sufficiency of the evidence" and "weight of the evidence" are quantitatively and qualitatively different. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 678 N.E.2d 541, paragraph two of the syllabus. We have held, "To reverse a judgment of a trial court on the basis that the judgment is not sustained by sufficient evidence, only a concurring majority of a panel of a court of appeals reviewing the judgment is necessary." Id., paragraph three of the syllabus. However, to "reverse a judgment of a trial court on the weight of the evidence, when the judgment results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required." Id., paragraph four of the syllabus.

{¶39} While elsewhere calling it a sufficiency argument, the court of appeals ultimately held that "appellant's [defendant's] argument that his conviction

for felony-murder was against the *manifest weight* of the evidence is sustained, albeit for different reasons than set forth in his brief." (Emphasis added.) In reviewing the basis for its reversal, we find that the court of appeals clearly weighed the evidence to reach its conclusion as to the appropriateness of the felony murder charge. Thus, the court of appeals' reversal of the judgment of the trial court based on the manifest weight of the evidence was unconstitutional with the concurrence of only two judges.[1]

### Hearsay

{¶40} During the course of defendant's trial, Ken Sironen, a coworker of Lisa's, testified that on the afternoon of September 4, 1998, just hours before defendant shot and killed Lisa, Lisa told him, "If I would come up shot in the head, that bastard [defendant] did it." The court of appeals held that this statement was hearsay, that did not fall into any exception, and therefore should not have been admitted. The court held that the statement in question went beyond Lisa's then-existing state of mind. "If she had merely said that she was fearful of appellant, that would have been admissible. Instead, she expressed her specific belief that appellant might kill her by shooting her in the head. That culpability is precisely what the state was attempting to prove. Thus, this statement fell within the exception to the exception as set forth in the latter half of Evid.R. 803(3) which specifically excluded 'a statement of memory or belief to prove the fact remembered or believed.' " (Emphasis omitted.) We disagree.

{¶41} Evid.R. 803 states:

{¶42} "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

{¶43} "* * *

---

1. We note that the court of appeals sent the matter back for a new trial. Defendant was indicted on aggravated murder and felony murder. The jury acquitted him of aggravated murder, and the court of appeals reversed his conviction for felony murder and held that the jury should not have considered it. From our reading, there were no charges left on which defendant could be tried.

**{¶44}** "(3) * * * A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

**{¶45}** In *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 21, 514 N.E.2d 394, this court permitted testimony that the victim was fearful and apprehensive, but we held that the state-of-mind exception "does not permit witnesses to relate any of the declarant's statements as to why he held a particular state of mind." Further, we held that the testimony sought to be introduced must refer to the present rather than the past. Id.

**{¶46}** Out-of-court statements about a declarant's then-existing mental condition are considered trustworthy because their spontaneity makes them as reliable as similar kinds of statements made on the witness stand. Weissenberger, Ohio Evidence (2002) 414, Section 803.30. However, the court of appeals held that this statement as to why the victim feared the defendant was too detailed. We disagree.

**{¶47}** The trial court voir dired Sironen extensively before letting him testify and limited his testimony to the statement, "If I would come up shot in the head, that bastard did it." We conclude that the statement was properly admitted as an expression of Lisa's fear of her husband and did not include detail as to why Lisa feared her husband. Therefore, under *Apanovitch,* the statement was admissible.

**Conclusion**

**{¶48}** Because we hold that felony murder as defined in R.C. 2903.02(B), with the underlying offense of violence being felonious assault, is supported by evidence that establishes that the defendant knowingly caused physical harm to the victim, we reverse the judgment of the court of appeals and reinstate the judgment of the trial court. Moreover, we hold that the court of appeals' split decision reversing the trial court's judgment based on the manifest weight of the evidence was unconstitutional pursuant to Section 3(B)(3), Article IV, Ohio Constitution.

Judgment reversed

and verdict reinstated.

DOUGLAS, RESNICK and F.E. SWEENEY, JJ., concur.

MOYER, C.J., PFEIFER and COOK, JJ., concur in judgment only.

_____

**COOK, J., concurring in judgment only.**

**{¶49}** There was sufficient evidence to support Miller's conviction for felony murder under R.C. 2903.02(B). I therefore agree with the majority's resolution of the state's first proposition of law. I cannot agree, however, with the majority's treatment of the remaining propositions.

**{¶50}** The majority sustains the state's second proposition of law, concluding that the court of appeals committed constitutional error by reversing the trial court's judgment on a manifest-weight-of-the-evidence rationale with the concurrence of only two judges. See Section 3(B)(3), Article IV, Ohio Constitution. This conclusion is judicially imprudent and legally incorrect. First, the majority's resolution of the first proposition of law necessarily decides that the court of appeals erred in its analysis of the felony murder issue. Our decision that the court of appeals should not have reversed *at all* on that issue renders moot any discussion of whether the court of appeals was required to do so unanimously.

**{¶51}** Second, the majority's resolution of the unanimity issue is simply wrong as a matter of law. It is true that the court of appeals sustained an assignment of error in which Miller alleged that his felony murder conviction was against the manifest weight of the evidence. But even a cursory reading of the opinion below shows that the court of appeals did not actually hold that Miller's conviction was against the manifest weight of the evidence. Rather, the court of appeals held (incorrectly) that "the charge against appellant of felony-murder, based upon the underlying crime of felonious assault, was not possible," and thus, "it was error for the trial court to allow that charge to go to the jury." This rationale reveals nothing other than the court of appeals' belief that there was *insufficient evidence as a matter of law* to allow the jury to consider a felony-murder instruction. And a reversal based on insufficiency of evidence does not require unanimity on the part of the court of appeals. See Section 3(B)(3), Article IV, Ohio Constitution; *State v. Thompkins* (1997), 78 Ohio St.3d 380, 678 N.E.2d 541, paragraph three of the syllabus.

**{¶52}** Finally, I decline to join the majority's disposition of the hearsay issue raised in the state's third proposition of law. The majority decides that the statement at issue—the victim's declaration, "If I would come up shot in the head, that bastard [Miller] did it"—is admissible under the Evid.R. 803(3) exception to the hearsay rule. Evid.R. 803(3) allows evidence of an otherwise inadmissible hearsay statement that is "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), *but not including a statement of memory or belief to prove the fact remembered or believed* unless it relates to the execution, revocation, identification, or terms of declarant's will." (Emphasis added.)

**{¶53}** It is true that our cases have applied Evid.R. 803(3) to permit testimony that the victim was fearful of the defendant. See, e.g., *State v. O'Neal*

(2000), 87 Ohio St.3d 402, 411, 721 N.E.2d 73; *State v. Reynolds* (1998), 80 Ohio St.3d 670, 677, 687 N.E.2d 1358; *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 21, 514 N.E.2d 394. But the statement at issue in this case says nothing about the victim's fear of Miller; it states only the victim's *belief* that Miller would be her killer if she were ever "shot in the head." Such a statement is beyond the scope of the Evid.R. 803(3) exception. Cf. *State v. Awkal* (1996), 76 Ohio St.3d 324, 331, 667 N.E.2d 960 (noting that certain statements, while indicative of the victim's state of mind, exceeded the scope of the *Apanovitch* rule because they did not indicate that the victim feared the defendant). In concluding otherwise, the majority has interpreted Evid.R. 803(3) to allow something that the plain language of the rule forbids—a hearsay statement of belief to prove the fact believed.

{¶54} I would therefore find that the victim's statement was inadmissible hearsay. I still agree, however, with today's decision to reverse the judgment of the court of appeals because the trial court's admission of the hearsay statement was harmless beyond a reasonable doubt. The fact that Miller caused his wife's death was not at issue; the only question was whether Miller shot her knowingly, purposely, or accidentally. The wife's hearsay statement was probative, if at all, to the question of whether Miller purposely killed her. The trial outcome, however, establishes that the jury was unaffected by the hearsay statement's implication of a purpose to kill. The fact that the jury found Miller guilty of felony murder under R.C. 2903.02(B) rather than aggravated murder under R.C. 2903.01(A) establishes that the jury was unconvinced that Miller acted purposely. Accordingly, Miller suffered no discernible prejudice from the erroneous admission of hearsay testimony.

{¶55} For the foregoing reasons, I concur in the judgment but decline to join the opinion of the majority.

MOYER, C.J., and PFEIFER, J., concur in the foregoing opinion.

———————————

Thomas L. Sartini, Ashtabula County Prosecuting Attorney, Angela M. Scott and Ariana E. Tarighati, Assistant Prosecuting Attorneys, for appellant.

Richard J. Perez, Rosplock & Perez, for appellee.

Victor V. Vigluicci, Portage County Prosecuting Attorney, and Kelli K. Norman, Assistant Prosecuting Attorney, urging reversal for amicus curiae Ohio Prosecuting Attorneys Association.

_____