[Cite as *State v. Everett*, **2012-Ohio-2740.**]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. Patricia A. Delaney, P.J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
| | : | Hon. Julie A. Edwards, J. |
| -vs- | : | |
| | : | Case No. 2011CA00115 |
| CORTEZ EVERETT | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Stark County Court of Common Pleas, Case No. 2010 CR 1855(A)

JUDGMENT:      AFFIRMED

DATE OF JUDGMENT ENTRY:      June 11, 2012

APPEARANCES:

For Appellant:

ANTHONY KAPLANIS
701 Courtyard Centre
116 Cleveland Ave. NW
Canton, OH 44702

For Appellee:

JOHN D. FERRERO, JR.
STARK COUNTY PROSECUTOR
RENEE M. WATSON
110 Central Plaza South – Ste. 510
Canton, OH 44702-1413

*Delaney, J.*

{¶1}  Appellant Cortez Everett appeals from the April 21, 2011 judgment entry of the Stark County Court of Common Pleas convicting him of one count of murder with a firearm specification, one count of felonious assault with a firearm specification, one count of aggravated robbery, one count of tampering with evidence, and one count of having weapons under disability and sentencing him to an aggregate consecutive prison term of 38 years to life.  Appellee is the state of Ohio.

*FACTS[1] AND PROCEDURAL HISTORY*

{¶2}  This case arose on December 2, 2010, around 11:00 p.m., when Tiffany Robinson and Heather Snyder arrived at Sparky's, a bar in Canton, Ohio.  Shortly after their arrival, they met Dennis Robb at the pool table.  Robb wore a camouflage jumpsuit because he had apparently been hunting earlier that day.

*A Robbery Plan is Devised at Sparky's*

{¶3}  Robinson and Robb began playing pool.  Robb proposed that if he won, Robinson would come home with him.  As they played, Robb bought drinks for Robinson and Snyder.  When he pulled a large amount of cash from his pocket to pay for the drinks, Robinson thought, "I got to get some of that."

{¶4}  Robinson told Snyder Robb had a large amount of cash and he wanted her to come home with him.

{¶5}  Appellant and Lorenzo Burton were also in Sparky's that night.  Appellant spoke with Robinson, and at one point Robinson and appellant simulated "making out and stuff" on the pool table, to the extent that appellant was thrown out of the bar,

---

[1] The following facts are adduced from testimony at appellant's trial, and are therefore presented from the perspectives of several different participants.

although he eventually returned. Everyone was drinking, and Robinson later claimed appellant seemed drunk because he was drinking shots and slurring his words.

{¶6} While still at Sparky's, Robinson spoke with Snyder, appellant, and Burton about meeting up back at the Highland Park apartments where Snyder lived to rob Robb. Robinson claimed that no one talked about bringing or using a gun, although the plan was to "strong arm" Robb into giving up his cash. Burton later testified that no exact plan was made as to how the robbery would be accomplished, beyond the fact that everyone would meet up at the Highland Park apartments.

{¶7} The group stayed at Sparky's until 2:00 a.m. Robinson and Robb left together in Robb's vehicle with Robinson driving. Snyder left in her car, and appellant left with Burton.

*Murder at Apartment 12 in Highland Park*

{¶8} Robinson and Robb drove to several locations including Highland Park, but left because Snyder's car wasn't in the parking lot yet and they planned to use her apartment. After driving around, they returned to Highland Park because Snyder was now calling Robinson, telling her to hurry up.

{¶9} The weather was cold and snowy that night. When Robinson pulled into the lot at 720 Highland Park, she "fishtailed" in Robb's car. Burton and appellant were already there. As she and Robb got out of the car, Robinson saw her father, Marzette Adkins, appellant, and Burton in the parking lot. Robinson stopped to speak to her father and gave him a hug. Robinson then ran into the building because she "had to pee," with Robb following slowly behind her.

{¶10} At some point before they entered the building, appellant showed Burton a gun, which Burton recognized to be an automatic.

{¶11} The Highland Park apartment complex, part of which is known as Skyline Terrace, is operated by the Stark Metropolitan Housing Authority.  The complex is made up of a number of separate buildings composed of multiple apartments with the same floor plan.  Each building is three stories high, with four individual apartments on each floor.  A stairway rises in the center of each floor, with two apartments on either side of the stairway.

{¶12} Robinson went to apartment 12, Snyder's apartment, located on the third (and top) floor of building 720.  Andre McClain let Robinson into the apartment.  Robinson went into the bathroom, and then into the bedroom where Snyder was in bed with McClain.  Robb, appellant, and Burton were in the hallway outside apartment 12.  Appellant had a bottle of beer. Burton saw him toss it at the door of another apartment, which led a man inside to open the door.

{¶13} Robinson brought Robb into apartment 12 and the two went into a back room "for five minutes."  Snyder then called Robinson into the bathroom and said, "He can't be here, he got to leave.  Cortez and them in the hallway trippin.'"

{¶14} Robinson stated the original plan had been to get Robb into the apartment to rob him.  Instead, after this conversation with Snyder, Robinson and Robb went back into the hallway, where appellant stood with Burton.

{¶15} Robinson testified appellant pulled a gun from his pocket, stuck it in Robb's face, and stated "Where's the money at?"  Robb replied he didn't have any money on him but would take the group to an ATM if they wanted money.  Appellant

asked "How much?" and Robb replied it was hard to tell him with a gun in his face. Burton went through Robb's pockets.

{¶16} Appellant said "Man, quit playing, where the money at?" and "swung" the gun, first accidentally striking Burton. Burton fell. Appellant told Robb that he made him hit Burton.

{¶17} Appellant swung the gun again and struck Robb on the left side of his face. Robinson testified appellant swung the gun at Robb yet again, and this time it fired. Robb fell to the floor.

*The Aftermath of the Murder*

{¶18} Robinson, appellant, and Burton ran down the stairs. Robinson went to the parking lot in front of building 720. Burton ran out the back door of the apartment building on the second floor. He and appellant went in different directions. Robinson had Robb's car keys and cell phone; she wiped them of fingerprints and threw them into Robb's car. Robinson then fled to another apartment, in another building, where her father was.

{¶19} Appellant eventually came into the building and spoke to Robinson. He said, "Who shot that man? You don't know who shot that man." Robinson and appellant were still talking to each other when police arrived. Robinson and her father went into the parking lot, and appellant said, "Man, we need to go see what's going on over there."

{¶20} Robinson and appellant returned to building 720. Robinson went to the second floor and asked police if she could come upstairs, but they refused. Appellant was in building 720 as well, loitering on the first floor.

{¶21} Robinson spent that night at her grandmother's house and returned to Cleveland the next day. She later returned to Canton to turn herself in. Robinson's initial statement to police left out her role in the murder. After she was charged, she agreed to give another statement, and this statement was consistent with her testimony and included the plan for the robbery. The plan was devised by Robinson, appellant, Burton, and Snyder.

*What the Neighbor Saw*

{¶22} Calvin Jeff lived in building 720, apartment 10, which is located on the same side of the hallway and next door to apartment 12. On December 2, 2010, Jeff worked second shift and returned home around 2:30 a.m. He ate dinner and was on the computer as his wife and daughter slept elsewhere in the apartment.

{¶23} Jeff's attention was drawn by a lot of noise outside; he heard a woman yelling "I got to pee." Jeff looked out into the parking lot of 720 and saw a black female run into the building. He also saw a 2-door car pull up and two men got out. He could hear the woman come upstairs and go into the apartment next door.

{¶24} He heard the woman leave the apartment and go downstairs. Jeff looked back out into the parking lot, and saw three men outside. He saw the woman hug one of the men. The group then came into the building.

{¶25} Jeff heard commotion in the hallway and something hit the front door of his apartment. He opened the door and discovered that someone had thrown a beer bottle against his door. Present in the hallway were appellant and the woman Jeff had observed.

{¶26} Jeff asked appellant why he threw a bottle at his door at 2:30 a.m. Appellant didn't respond but kicked the bottle across the hall. Appellant then came close to Jeff, tapped him on the stomach, and said "It's cool, big man, go in the house." Jeff watched appellant walk away, and he closed the door.

{¶27} As the door closed, Jeff observed appellant and the woman in the hallway. He saw the top of the head of another black male coming up the stairwell. He could also see a white male coming up the stairs. The white male, dressed in full camouflage, walked past a black male leaning on the railing of the stairway as Jeff closed his door.

{¶28} At that point, Jeff later testified, there were four people in the hallway: two black males, the white male, and the black female. Jeff returned to his computer.

{¶29} Next, Jeff heard a loud click, "like a gun being chambered, and a pop." Jeff testified that he is familiar with the sound of a round being chambered in a gun, and that it sounds like "ch, ch," which is the sound he heard in the hallway. He heard a "boom" and knew that a shot had been fired.

{¶30} Jeff believed the shot had been directed at him, and called 911 to report shots fired. Jeff went into the bedroom of his apartment.

{¶31} A neighbor called to tell Jeff that there was a dead body outside his door. Jeff looked out and saw the body of the white male in full camouflage that he had seen earlier. No one else was around.

{¶32} Jeff gave a statement to the police and later testified at trial. He stated that he never actually saw anyone with a gun and did not know who fired it.

*The Investigation and the Physical Evidence*

{¶33} Officer Christopher Heslop of the Canton Police Department was the first to respond to the scene upon a call of shots fired at 720 Highland Park. Heslop was dispatched at 2:41 a.m.

{¶34} Heslop described the eerie silence that greeted him as he entered building 720 with his gun drawn. Heslop mounted the stairs and cleared each floor. As he reached the third floor, he saw a body lying in the hallway. He also observed a shell casing on the steps of the stairwell.

{¶35} Heslop approached the body, that of an older white male wearing camouflage clothing. Heslop observed significant trauma to the head and a large amount of blood on the floor. The body laid face-down, with his feet at the door of apartment 12.

{¶36} In light of the position of the body, Heslop felt that apartment 12 was involved in the crime. He knocked on the door and Snyder answered. Present in the apartment were Snyder, McClain, and two children. Heslop described Snyder's demeanor as "awkward." The occupants of apartment 12 were taken to the Canton Police Department for questioning.

{¶37} Additional officers located a magazine, or clip, containing bullets for a gun lying in the snow between building 720 and building 800. The clip was found behind the building. They observed fresh tracks in the snow leading from 720 to 800.

{¶38} Officer Michael Rastetter also responded to building 720. He was met by another officer who pointed out an individual who was loitering around the building and had come up to the second floor. Rastetter was asked to detain this individual, later

identified as appellant. Per instructions, Rastetter cuffed appellant, put him in his cruiser, and transported him back to the police department for questioning.

{¶39} While en route, appellant asked several times what was happening upstairs at the apartment building. He told Rastetter he was just looking for his keys. Rastetter brought appellant into an interview room and was about to uncuff him when he looked down and noticed what appeared to be blood spatter on appellant's white tennis shoes. Rastetter advised detectives of what he observed.

{¶40} Sgt. Prince was one of the detectives who interviewed appellant. The statement was video and audio-taped. Two hours and twenty minutes into the interview, appellant stated he swung the gun at Robb and it went off.

{¶41} Stark County Coroner Dr. P.S. Murthy performed an autopsy on Dennis Robb and noted the only sign of injury was a gunshot wound to the left side of Robb's face. Dr. Murthy found a considerable amount of soot, or burnt gunpowder, in the wound, leading him to conclude the handgun was very close to Robb's face when fired, perhaps even touching it. The gunshot wound caused "massive destruction" to Robb's brain; the bullet did not exit the skull, and was recovered during the autopsy.

{¶42} The physical evidence at trial included appellant's white tennis shoes which still contained obvious blood stains. A swab of the bloodstain was tested by the Stark County Crime Lab, which confirmed the presence of DNA. Dennis Robb was determined to be the source of the DNA in the blood on appellant's shoes.

{¶43} Additional bloodstains and DNA belonging to Dennis Robb were found on the lower left leg of appellant's sweatpants.

{¶44} The state also presented the Bud Ice beer bottle found in the third-floor hallway of building 720.  The beer bottle contained one latent fingerprint which was identified as appellant's.

{¶45} State's exhibits three and four, respectively, were the spent 9-millimeter caliber Remington Peters shell casing found in the stairway and the Hi-Point cartridge magazine found behind building 720.  Inside the clip were four 9-millimeter caliber Remington Peters jacketed hollow-point cartridges.  None of these items contained fingerprints of comparison value.  The spent shell casing and the shells still in the magazine were found to have cycled through the same weapon.

{¶46} State's exhibit 12 was the deformed jacketed hollow point bullet returned by the Stark County Coroner's Office from the body of Dennis Robb.

{¶47} The evidence also included a gunshot wound swab of Robb's injuries which demonstrated the muzzle of the gun was within 6 inches or less of Robb's face when fired.  The state also presented two autopsy photographs over defense objection.  One photo showed the entrance wound and the other showed the bullet fragment in the skull.

*The Firearm Hypothetical*

{¶48} The state's presentation of evidence included a demonstration of the loading of a Hi-Point automatic weapon, similar to what the state theorized was used in this crime.

{¶49} The following conversation took place between the prosecutor and the firearm expert from the Stark County Crime Lab:

* * *.

Q:  In your employment at the Canton-Stark County Crime Lab, have you had experience in the past in attempting to show an accidental discharge of a firearm, such as a Hi-Point?

A:  Yes, I have.

Q:  Did that case specifically involve a Hi-Point firearm?

A:  Yes, it did.

Q:  What attempts did you make to get that weapon to accidentally discharge when it was loaded and ready to fire?

A:  It was struck repeatedly with a large rubber mallet on every side; the base, the back of the firearm, the muzzle of the firearm.  It was struck repeatedly for about 10 to 15 minutes trying to get it to drop the firing pin and create an accidental discharge.

Q:  Did it ever create an accidental discharge?

A:  No, it didn't.

Q:  Now, based upon that and your training, education, and experience, I want to ask you a hypothetical.  Assume for this question that a person has a loaded 9 millimeter Hi-Point handgun, there's a round in the chamber, and that person begins to strike a person in the face with that gun.  The second time he strikes that person in the face, the gun discharges.  Would that, in your experience, striking that person in the face, cause an accidental discharge?

[Defense counsel:]  Objection.

The Court:  Overruled.

The Witness:  It is not likely to create an accidental discharge.  The only way to discharge that firearm is to depress the trigger and the trigger transfer to release the firing pin.

[By prosecutor:]

Q:  So in that situation, if the firearm discharged, the person's finger would have had to have been on the trigger?

A:  That's correct.

* * * .

The witness agreed on cross-examination that the hypothetical above could be different depending upon the individual weapon and modifications.  No weapon was ever found in this case.

*Criminal Charges, Conviction, and Sentence*

{¶50} Appellant was charged by indictment with one count of murder with a firearm specification, one count of felonious assault with a firearm specification, one count of aggravated robbery with a firearm specification, one count of tampering with evidence, and one count of having a weapon under disability.

{¶51} Appellant's accomplices in the robbery also faced criminal charges and entered guilty pleas in exchange for reduced sentences as part of agreements to testify against appellant.  In exchange for her testimony, Tiffany Robinson was not charged with complicity to murder.  She entered a plea of guilty to one count of complicity to aggravated robbery with a firearm specification and is serving a prison term of eight years.  Lorenzo Burton also entered a plea of guilty to one count of

complicity to aggravated robbery with a firearm specification and is serving a prison term of eight years.

{¶52} Appellant entered a plea of not guilty and the case proceeded to trial by jury. (The single count of having a weapon under disability was tried to the court and was not raised in the presence of the jury.) Appellant moved for a judgment of acquittal pursuant to Crim.R. 29 at the close of the state's evidence and at the close of all of the evidence, and the motions were overruled.

{¶53} Appellant was found guilty as charged. The parties agreed that the counts of murder and felonious assault merge for sentencing purposes, as do the three separate firearm specifications. Appellant was therefore sentenced to a prison term of 15 years to life on the count of murder, plus three years for the firearm specification, consecutive to 10 years on the count of aggravated robbery, consecutive to 5 years on the count of tampering with evidence, and consecutive to 5 years on the count of having a weapon under disability.

{¶54} Appellant appeals from the judgment entry of conviction and sentence.

{¶55} Appellant raises two Assignments of Error:

{¶56} "I. THE TRIAL COURT'S FINDING OF GUILTY MURDER BEYOND A REASONABLE DOUBT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE."

{¶57} "II. THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL UNDER ARTICLE I SECTION 1O OF THE OHIO CONSTITUTION AND THE SIXTH AMENDMENT TO THE UNITED STATE CONSTITUTION."

I.

{¶58} Appellant argues in his first assignment of error that his conviction is against the manifest weight and sufficiency of the evidence. Specifically, he argues appellee failed to establish at the time he was committing felonious assault by striking Robb with the gun, there existed in appellant's mind an awareness of the probability he was causing the death of Robb. We disagree.

{¶59} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilty beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶60} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the

conviction must be overturned and a new trial ordered." *State v. Thompkins*, supra, at 387, 678 N.E.2d 541. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶61} Appellant was charged with one count of murder pursuant to R.C. 2903.02(B), which states: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of R.C. 2903.03 or 2903.04 of the Revised Code." The predicate offense in this case is felonious assault pursuant to R.C. 2903.11(A)(2): "No person shall * * * cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

{¶62} Appellant asserts that appellee failed to establish whether, as he swung the gun at Robb's head, appellant was aware of the probability of causing Robb's death. As the state points out, however, the Ohio Supreme Court has held "[f]elony murder as defined in R.C. 2903.02(B), with the underlying offense of violence being felonious assault, is supported by evidence that establishes that the defendant knowingly caused physical harm to the victim." *State v. Miller*, 96 Ohio St.3d 384, 2002-Ohio-4931, 775 N.E.2d 498, syllabus. Such evidence exists, abundantly, in this case.

{¶63} As the jury was instructed, "[a] person acts knowingly, regardless of purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶64} Appellant's conviction is supported by sufficient evidence and is not against the manifest weight of the evidence based in part upon appellant's own admissions. The jury was free to accept appellant's explanation: he did not intend to kill Robb, only to hit him with the gun, but in striking him, the gun accidentally discharged. Appellant's admission alone indicates that he was aware that his conduct would probably cause the certain result of harm to Dennis Robb. Contrary to appellant's arguments here, such evidence establishes felony murder.

{¶65} If appellant knowingly caused physical harm to Dennis Robb by striking him with the gun, he is guilty of felonious assault. "The fact that [Robb] died from [his] injuries makes him guilty of felony murder, regardless of his purpose." *State v. Miller*, supra, 2002-Ohio-4931, ¶ 33.

{¶66} In its review of Ohio's felony-murder statute in the case of *State v. Mays,* 2nd Dist. No. 24168, 2012-Ohio-838, ¶ 10, the Second District Court of Appeals noted the intent to kill is presumed where the state proves the required intent to commit the underlying felony, thereby punishing those felonious assaults which end in death as murder:

> * * *[I]t must first be determined that the conduct was the cause in fact of the result, meaning that the result would not have occurred 'but for' the conduct. Second, when the result varied from the harm intended or hazarded, it must be determined that the result achieved was not so extraordinary or surprising that it would be simply unfair to hold the defendant criminally responsible for something so unforeseeable. (Citations omitted).

{¶67} In this case, appellant's action striking Robb with the gun is the cause in fact of the gun firing and killing Robb. Perhaps appellant intended only to strong arm Robb and to intimidate him with the gun, but the result was that the gun discharged. Even if the jury believed that appellant only intended to hit Robb, the evidence is sufficient to establish felony murder.

{¶68} We note, moreover, the jury may have believed the shooting and killing of Robb did not come about accidentally as appellant claimed, and appellant in fact chambered a round and had his finger on the trigger as he demanded Robb's money. Or the jury may have believed that appellant only intended to hit Robb with the gun, out of anger that he wasn't producing the cash fast enough or appellant's frustration in striking his accomplice Burton. The finder of fact is free to accept or reject the evidence as it sees fit.

{¶69} Our review of the record also fails to persuade us that the jury clearly lost its way and created such a manifest miscarriage of justice that appellant's convictions must be overturned and a new trial ordered. The jury was free to reject the defense's theory, presented in closing argument, that no proof existed appellant knew the gun was loaded.

{¶70} The state presented ample evidence to support the convictions, including appellant's own statement to police. As the weight to be given the evidence and the credibility of the witnesses were for the trier of fact to determine, in resolving conflicts and limitations in the testimony, the jury could have found that appellant knowingly caused physical harm to Robb by means of a deadly weapon, and that as a proximate result of the assault he caused Robb's death.

{¶71} The record reflects substantial, credible evidence from which the trial court could have reasonably concluded appellee proved all the elements of the charged offenses beyond a reasonable doubt.

{¶72} Appellant's first assignment of error is overruled.

II.

{¶73} Appellant contends in his second assignment of error that he received ineffective assistance of counsel when counsel failed to object to portions of the video and audio-taped statement played for the jury.

{¶74} To succeed on a claim of ineffectiveness, a defendant must satisfy a two-prong test. Initially, a defendant must show that trial counsel acted incompetently. *See*, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). In assessing such claims, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158 (1955).

{¶75} "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* supra, 466 U.S. at 689. The question is whether counsel acted "outside the wide range of professionally competent assistance." *Id.* at 690.

{¶76} Even if a defendant shows that counsel was incompetent, the defendant must then satisfy the second prong of the *Strickland* test. Under this "actual prejudice" prong, the defendant must show that "there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

{¶77} Portions of appellant's statement to police, as shown to the jury at trial, contained references to appellant's criminal history, a pending felonious assault charge, and statements by detectives about the legal definition of "murder." Appellant's trial counsel requested a limiting instruction and discussed how to introduce the fact that appellant had been acquitted of the felonious assault charge. The trial court consequently gave the following instruction to the jury:

* * *.

THE COURT:  I do—before I let you go for the day, I want to give you a couple instructions about some evidence that was heard this afternoon.

During the videotaped statement of [appellant] with police officers, there were a couple things on there I want to give you some special instructions of the Court on.

First of all, there was a reference made in there about a charge of felonious assault.  And I would indicate to you that that charge or anything that has to do with that charge has absolutely no relevancy to this case.  It has nothing to do with whether he's guilty or not guilty of this crime.  It's a different incident.

I'll even go further and tell you, as a result of that charge, he ended up being acquitted, he was found not guilty of that charge.

The second issue has to do with there was some references made, as there frequently is, the police officer interrogation like this, where they talked about various statutes that might apply.  What's aggravated murder, what's murder,

what's this mean or what's that mean. All those things are their opinions and they're not necessarily true. So you should not accept anything that they had to say or that [appellant] may have said back as to what constituted a particular crime as being accurate.

I will give you the instructions of law. I control what is or is not the crime that has been charged in this case as far as what the legal concepts are. You'll get all those at the end of the case in great detail. We'll have written instructions that will be provided to you, you'll each have a copy, and those will give you very specific instructions.

When we talk about the crime of murder, this particular fact situation, what is the crime of murder in this fact situation, whether that's been committed or not committed, of course, you will ultimately decide from a standpoint of whether the [appellant] is guilty or not guilty of the crime. But I'll give you all the legal definitions that apply.

* * *.

{¶78} Appellant asserts, however, that his trial counsel was ineffective for failing to make a motion to keep the objectionable portions of the video from the jury in the first place. We disagree.

{¶79} We note that a properly licensed attorney is presumed competent. See *Vaughn v. Maxwell*, 2 Ohio St.2d 299, 209 N.E.2d 164 (1965); *State v. Calhoun*, 86 Ohio St.3d 279, 714 N.E.2d 905 (1999). Further, reviewing courts must refrain from second-guessing strategic decisions and presume that counsel's performance falls

within the wide range of reasonable legal assistance. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995).

{¶80} Counsel did in fact address the issue of the objectionable statements on the tape, and chose to address the comments with a limiting instruction from the trial court. This was clearly a strategic decision as counsel weighed the option of introducing the judgment entry of acquittal in the felonious assault case discussed in the statement. Defense trial counsel made the calculated decision that a jury instruction was the best way to address the issue without unnecessarily emphasizing it. We are unwilling to characterize this strategic decision as ineffective assistance. Moreover, the jury is presumed to follow the instructions of the trial court. *Pang v. Minch*, 53 Ohio St.3d 186, 187, 559 N.E.2d 1313 (1990), paragraph four of the syllabus.

{¶81} We find any error by trial counsel in connection with the taped statement was not so serious as to deprive appellant of a fair trial. Moreover, we cannot conclude that but for the admission of the objectionable portions of the statement, the result of the proceeding would have been different. As such, appellant has failed to demonstrate prejudice resulting from trial counsel's alleged error sufficient to sustain his claim of ineffective assistance.

{¶82} Appellant's second assignment of error is therefore overruled.

{¶83} Having overruled both of appellant's assignments of error, we hereby affirm the judgment of the Stark County Court of Common Pleas.

By: Delaney, P.J.

Wise, J. and

Edwards, J. concur.


       HON. PATRICIA A. DELANEY


       HON. JOHN W. WISE


       HON. JULIE A. EDWARDS

[Cite as *State v. Everett*, **2012-Ohio-2740.**]

IN THE COURT OF APPEALS FOR STARK COUNTY, OHIO

FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| | : | |
| Plaintiff-Appellee | : | |
| | : | |
| -vs- | : | JUDGMENT ENTRY |
| | : | |
| CORTEZ EVERETT | : | |
| | : | |
| | : | Case No. 2011CA00115 |
| Defendant-Appellant | : | |

 

For the reasons stated in our accompanying Opinion on file, the judgment of the

Stark County Court of Common Pleas is affirmed.  Costs assessed to appellant.

 

_____
HON. PATRICIA A. DELANEY

 

_____
HON. JOHN W. WISE

 

_____
HON. JULIE A. EDWARDS