[Cite as *State v. Moore*, 2016-Ohio-828.]

COURT OF APPEALS
COSHOCTON COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | Case No. 14CA0028 |
| | : | |
| VINCENT C. MOORE | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Coshocton County Court of Common Pleas, Case No. 13 CR 0052

JUDGMENT:      AFFIRMED

DATE OF JUDGMENT ENTRY:      March 2, 2016

APPEARANCES:

For Plaintiff-Appellee:

JASON W. GIVEN
COSHOCTON CO. PROSECUTOR
318 Chestnut St.
Coshocton, OH 43812

For Defendant-Appellant:

ALLEN VENDER
OHIO PUBLIC DEFENDER
250 East Broad St., Suite 1400
Columbus, OH 43215

*Delaney, J.*

{¶1} Appellant Vincent C. Moore appeals from the November 19, 2014 Judgment Entry Jury Verdicts of the Coshocton County Court of Common Pleas. Appellee is the state of Ohio.

## FACTS AND PROCEDURAL HISTORY

{¶2} This case arises from an incident on April 7, 2013, when appellant fought with victim Matt Gadfield at the Cedar Street Inn in Coshocton, Ohio. Appellant fatally stabbed Gadfield during the fight. The following evidence is adduced from the jury trial.

### The First Fight:  March 24, 2013 at Kids America

{¶3} Appellant, Gadfield, and K'Marr Cooper knew each other from school, sports, and athletic training. Gadfield and Cooper trained together at a boxing gym.

{¶4} On March 24, 2013, Cooper walked to Kids America, an athletic facility, to play basketball. Appellant drove by and offered Cooper a ride.

{¶5} At Kids America, appellant and Cooper played basketball with a group of other men. The other players left and Cooper remained behind with appellant. Cooper planned to meet Gadfield at the facility because the two planned to run together. Gadfield arrived and the three started talking. Initially the conversation was friendly. There was some evidence Cooper and Gadfield wrestled on the floor, although in a friendly manner, and a dispute arose.

{¶6} A subsequent conversation between appellant and Gadfield became heated. Appellant called Gadfield a "bitch," told him to shut up, and said he didn't know what he was talking about. Appellant and Gadfield were arguing nose to nose while Cooper was seated on a bench about six feet away. Cooper testified Gadfield punched

appellant in the face and then "shot on him," a wrestling move in which Gadfield grabbed appellant by the legs and both fell to the ground.

{¶7} Gadfield was on top of appellant on the ground and appellant was bleeding from the mouth. According to Cooper, appellant said "I'm gonna kill this [expletive]" and "I got this blade in my pocket and I'm going to go to jail." Cooper pulled Gadfield off appellant. Once both were standing, appellant walked toward Gadfield with a knife in his hand. Cooper saw the blade of the knife which was pointed at the ground. Appellant advanced on Gadfield and Gadfield jogged backwards out the door. Appellant said "What now, do you want to fight now?"

{¶8} Appellant followed Gadfield out of the basketball court area. A manager of Kids America was at the front desk when Gadfield came running down the hallway and jumped behind the desk. Appellant followed behind him and the manager observed appellant's mouth was bleeding. Appellant told the manager Gadfield "sucker-punched" him[1] and the manager provided appellant with a towel to wipe up the blood. The manager testified appellant said he had a knife but the manager never saw one. Appellant and Gadfield were both expelled from the facility for fighting. Neither party wished to file criminal charges and no one called the Sheriff's Department.

{¶9} Cooper remained near the basketball court, where he eventually spoke to an employee of Kids America and admittedly downplayed the incident.

---

[1] Cooper testified Gadfield did not sucker-punch appellant; instead, appellant and Gadfield argued face to face and appellant "should have known it was coming."

**The Days Preceding the Second Fight**

{¶10} In the days after the fight, Cooper messaged appellant and said he was sorry Gadfield and appellant fought, especially because he and Gadfield are not supposed to fight outside the boxing gym because "their fists are weapons." Per Cooper, appellant responded "That's O.K., he's going to wish he was fighting lame ass James Harwell" and during another conversation, after Cooper again apologized, appellant said "It's O.K., I got something for him, I'm going to catch him slippin.'" Cooper understood this to mean appellant would catch Gadfield when he was least expecting it.

{¶11} Emily Finton knows appellant and dated a friend of Gadfield named Skyler McCoy. Finton testified that one day after school, she and McCoy went to K.F.C., which was appellant's workplace. Appellant was smoking a cigarette in the parking lot on a break and he and McCoy discussed the fight at Kids America. Finton testified appellant was very angry about the fight and said "Wait until I see him again, I'm going to kill him." Finton recalled this occurred on a Friday because that evening she had a dance recital. Before the recital, she and McCoy had a phone conversation with Gadfield via speakerphone and they told Gadfield appellant threatened to kill him. Finton did not take the threat seriously and did not report the threat to police. She came forward late in the investigation after speaking to Gadfield's mother, who encouraged her to report what she knew.

**The Second Fight: Cedar Street Inn, April 6 and 7, 2013**

*The Witnesses*

*Bouncer Pete Leach*

{¶12} The same Friday night as the K.F.C. conversation, during the late night hours of April 6, 2013 into April 7, 2013, Pete Leach worked as a bouncer at the Cedar Street Inn in Coshocton. Leach said the bar was busier that night than he had ever seen it. Leach's job that night included checking I.D.s at the door. He briefly stepped away from the door to speak to the D.J. and observed Gadfield walk into the bar with others. Leach immediately suspected Gadfield was underage; Leach caught up to him quickly and asked for Gadfield's I.D. but he said he didn't have one. Leach told him he had to leave because the bar was 21 and over only after 9:00 p.m. Gadfield said he was designated driver for his friends but Leach told him he had to leave. Leach testified Gadfield did not seem upset and turned around and walked out of the bar.

{¶13} Skyler McCoy also was with Gadfield and Leach suspected he was also underage, but a bartender said McCoy was "O.K." so Leach let him stay.

{¶14} Leach had also observed appellant sitting in the bar throughout the evening but had no interaction with him.

{¶15} Leach's attention was drawn to another patron who dropped a beer bottle which shattered on the cement floor. Leach was cleaning up the broken bottle when suddenly most of the people in the bar ran for the door. Leach struggled to get through the crowd to the door and out of the bar. He described the scene as chaotic. Outside the bar, Leach saw Gadfield stumbling toward him with his shirt off. Leach reached for

Gadfield and tried to catch him but Gadfield fell to the ground and his head struck the ground.

*Women outside the Bar*

{¶16} Michaela Udischas was sitting in a car in the parking lot of the bar while a friend went inside to look for a lost cell phone. She noticed a group of girls smoking on the porch and saw a "dark-colored" man go to a car as if to retrieve something from it. He opened the driver's door and appeared to be reaching into the car. The man shut the door and Udischas saw what she described as a "shadow" running through the parking lot. She next saw people swarming in front of the bar and heard screaming. From her position inside the car Udischas could see arms flying as though someone was removing a shirt. She saw the black man run back to the car and lock himself in; the crowd surrounded the car and people were beating on it.

{¶17} Tiffanie Clark was one of the girls on the porch. In front of the girls, in the parking lot in between the cars, Clark saw Gadfield and appellant fighting with their fists. Clark and her friends screamed for them to stop and the two fell to the ground. Clark described the fight as very quick and back-and-forth; it was already in progress when she and her friends noticed what was happening. First Gadfield was on top and then appellant was. Clark did not see any weapons.

{¶18} Suddenly appellant took off running away from the bar and Gadfield staggered toward the girls on the porch. Clark described Gadfield's face draining of color and said he looked helpless and desperate. She noticed blood on Gadfield's torso and he lifted his shirt and pulled it off. Clark saw "blood pouring" from his chest. She ran

inside the bar and screamed to the bartender to call 911 because someone had been stabbed. In the ensuing chaos, Clark was unable to get back outside.

*David Bratton, 911 Caller*

{¶19} David Bratton and a friend were just walking up to the Cedar Street Inn around midnight when they heard a woman say "quit fighting, this is stupid." As they approached the bar entrance, Bratton observed two people fighting on the ground. Bratton recalled both people getting up from the ground; he saw appellant run to the door of the bar and Gadfield staggered around the banister and bent over. Bratton saw a wallet on the ground and told Gadfield "here's your wallet" as Gadfield put his hands on his knees. Bratton thought he was out of breath. The Gadfield stood again, turned away from him, and pulled his shirt off. He heard a girl scream and he reached for Gadfield because he thought he was about to fight again. Gadfield turned back toward Bratton and he saw blood spurting from his chest. Gadfield staggered away a short distance and collapsed on the ground.

{¶20} Bratton immediately called 911. With the 911 operator, Bratton went back and forth describing Gadfield's condition and the silver Ford 300 he observed appellant get into. Gadfield's 911 call was played during his testimony; he told of efforts to give Gadfield C.P.R. and then said Gadfield was no longer breathing. He identified appellant to the operator as the black male who stabbed the victim and was now sitting in the passenger seat of the silver Ford 300.

**The Investigation**

{¶21} Detective Garrison Bryant of the Coshocton County Sheriff's Department was alerted to the stabbing at the Cedar Street Inn in the early morning hours of April 7, 2013. The victim was identified as Matt Gadfield and appellant was already in custody; he had remained on the scene after the stabbing and was still present when deputies arrived. Gadfield had already been transported to the hospital and Bryant was aware he might not survive. Appellant was also treated at the hospital for a self-inflicted wound to his right upper thigh. B.C.I. processed the crime scene, which included collecting evidence, taking photos, and diagramming the scene.

{¶22} The crime scene included the silver Ford 300 owned by appellant's girlfriend. The car was searched and a black Smith and Wesson knife was discovered on the right passenger side of the vehicle. The knife eventually tested positive for D.N.A. of both Gadfield and appellant. Appellant's bloodstained shirt contained his own D.N.A. and Gadfield's. Appellant's jeans had a gash corresponding to the upper right thigh and also contained D.N.A. of both appellant and Gadfield.

*Appellant's Videotaped Statement to Police*

{¶23} Bryant interviewed appellant at 11:00 a.m. on April 7, 2013, the morning after the incident, with another detective present. The interview was video recorded; the videotape was played at trial and transcribed into the record. During the interview, Bryant alternated asking about the Kids America incident and the stabbing at the Cedar Street Inn.

{¶24} Appellant described his knife as a black Smith and Wesson folding knife he used at work for cutting open boxes. The blade opens and the knife locks into place.

Appellant has alternately stated he only carries the knife for work and that he always carries it.  (T. 291, 936).

*Appellant's Statements to Bryant about Kids America Incident*

{¶25} During the interview, Bryant inquired whether the Kids America fight set the stage for the stabbing.  Appellant spoke about the fight at Kids America and said Gadfield had been fighting with K'Marr Cooper when appellant started "trash talking," saying Gadfield had to fight by sneaking up on people.  Appellant and Gadfield started arguing and appellant was taken by surprise when Gadfield hit him.  Appellant said Gadfield "went straight to [his] legs" to knock him off his feet, the same move he made in the bar parking lot the night before.

{¶26} The conversation went back and forth between the Kids America incident and the Cedar Street Inn incident.  Appellant denied threatening to stab Gadfield at Kids America, although he acknowledged Gadfield struck him and gave him a "big lip."  He denied making any threats to Gadfield during the incident or afterward.

{¶27} Appellant also denied that he had a knife at Kids America.  He had his cell phone in his hand while Gadfield was on top of him and Gadfield thought it was a knife. Appellant said he would not have had a knife with him because he went to Kids America to play basketball, not look for a fight, and his knife was something he used for work anyway.  Bryant challenged appellant with K'Marr Cooper's statement that appellant threatened Gadfield with a knife but appellant denied doing so.

*Appellant's Statements to Bryant about Cedar Street Inn Stabbing*

{¶28} Appellant described the Cedar Street Inn fight as completely unexpected. Appellant and his girlfriend went to the Cedar Street Inn with a friend named Ken from

appellant's work. They arrived around 10:30 p.m. after going to a comedy club earlier. The trio had a few drinks and played pool. Ken was intoxicated and threw up inside the bar; he went outside and played no further role in events.

{¶29} Appellant said he went to his girlfriend's car outside the bar to get a Black and Mild cigar. He retrieved the cigar, shut the car door, and turned back toward the bar when he observed Gadfield walking between the cars in the parking lot. Appellant said Gadfield knocked into him, "rushing him" from one side of the bar exterior to the other. Appellant's lip still hurt from the Kids America fight. When pressed by Bryant, appellant said Gadfield swung at him but missed, and appellant hit him first somewhere in the face. Gadfield "went to [appellant's] legs" and the two fell to the ground. Appellant described the two "scooting" across the parking lot as they fought, falling against cars. He said Gadfield was trying to pick him up.

{¶30} Appellant had no idea Gadfield was at the bar until he approached him in the parking lot. Appellant was aware several girls saw what happened, and Bryant pointed out there were some male witnesses as well. Appellant said he was not lying in wait for Gadfield, waiting for a chance to attack him. He was on his way back into the bar to return to his girlfriend when the confrontation occurred.

{¶31} Appellant said that in a repetition of the move from the Kids America incident, Gadfield hit him and "went straight to his legs." This time he was prepared for Gadfield's move and he wasn't knocked down; instead he scooted back against a car.

{¶32} Appellant acknowledged he did have a knife on him at the Cedar Street Inn. Appellant said he was trying to get up and his knife was in his pocket. He said he didn't know how the knife got out of his pocket and open, although he did recall reaching into

his pocket and he acknowledged the knife was open.  He recalled the knife was in his right hand.  At some point the knife cut him through his pants leg.

{¶33} Appellant denied lunging at Gadfield with the knife and said he had no intention of stabbing him; he said he was not trying to kill Gadfield, only to get Gadfield off of him.  Appellant also acknowledged he was just trying to "graze" Gadfield with the knife.  (T. 290).

{¶34} Appellant said he was not intoxicated; he had maybe six drinks the entire night, including at the comedy club earlier in the evening.  He also described himself as "tipsy" to explain why he didn't recall details of the stabbing.

{¶35} After the fight, appellant re-entered the bar and told his girlfriend it was time to leave.  He heard people say Gadfield had been stabbed and he said he hadn't stabbed anyone.  Appellant acknowledged he saw Gadfield take off his shirt and observed the wound in his side, which "shocked" him. Appellant asked police how many times Gadfield was stabbed and Bryant replied it appeared to be twice but he wasn't sure.

{¶36} When asked how the fight ended if appellant didn't realize Gadfield had been stabbed, appellant said he kicked Gadfield off of him, chased Gadfield a short distance, and then left him alone to return inside the bar to retrieve his girlfriend.  Bryant asked where the knife was at that point and appellant said it was in his pocket.  When told B.C.I. found the knife inside his girlfriend's car, appellant said he didn't remember putting it there.

{¶37} Appellant asked Bryant "how much time [he] was looking at."  Bryant and another detective told appellant during the interview that Gadfield "didn't make it" and appellant broke down crying, stating his life was over.

*Bryant's Statements Summarizing his Investigation*

{¶38} At trial, appellee asked Bryant, based upon his investigation including the interview of appellant, his opinion as to what occurred at Kids America. Bryant testified over objection appellant and Cooper played basketball and Gadfield arrived after the game ended. Gadfield and appellant got into a verbal confrontation and Gadfield struck appellant in the mouth. The two fell to the ground and Gadfield pinned appellant. Bryant further opined appellant pulled a knife and Gadfield jumped up and ran to the front desk. Bryant opined the fight was not an ambush; appellant and Gadfield argued back and forth.

{¶39} Bryant stressed appellant said he wanted to fight Gadfield; appellant said he knew Gadfield had a reputation as a good wrestler but he was not afraid of Gadfield and never said Gadfield was known to him as a good fighter. Appellant in fact insisted he wanted the opportunity to fight Gadfield at Kids America and asked him to "go outside" but Gadfield refused.

{¶40} Bryant further opined the incident at the Cedar Street Inn was hand-to-hand mutual combat. (T. 472). Appellant, however, escalated the fight by pulling a knife. There was no evidence Gadfield had any weapon. Bryant's investigation indicated appellant and Gadfield were hitting each other and Gadfield was trying to pick appellant up. Bryant testified appellant acknowledged he did try to cut Gadfield but didn't realize he had actually done so until he came back out of the bar and saw Gadfield take his shirt off.

{¶41} Bryant testified on cross examination he did not believe appellant came to the bar looking for Gadfield and did not think he was lying in wait for Gadfield.

*Indictment, Trial, and Conviction*

{¶42} Appellant was charged by indictment with one count of felony murder pursuant to R.C. 2903.02(B), an unclassified felony (Count I) and one count of felonious assault pursuant to R.C. 2903.11(A)(2), a felony of the second degree (Count II). Appellant entered pleas of not guilty and filed notice of his intent to assert the affirmative defense of self-defense.

{¶43} Appellant filed motions for appropriation of funds for a consulting investigation expert at court expense and for a "counseling (*sic*) defense psychologist" at court expense. Appellee opposed the motions and the trial court scheduled a hearing on the motions. On August 21, 2013, the trial court denied the motion for funds for a consulting defense psychologist and granted the motion for funds for a consulting investigation expert to the extent that the court authorized appropriation of $1,050.00 to be paid in increments of $35.00 per hour for 30 hours of investigative work.[2] A judgment entry dated February 25, 2014 authorized a total of $2,500.00 for services of a defense investigator.

{¶44} Appellant also filed a motion to suppress his statements to investigators which appellee opposed; the trial court overruled the motion to suppress after an evidentiary hearing.

{¶45} The case proceeded to trial by jury. Appellant moved for judgment of acquittal pursuant to Crim.R. 29(A) at the close of appellee's evidence and the motion was overruled.

---

[2] The trial court also initially overruled appellant's motion for a consulting forensic pathologist at state expense. The motion was later granted to the extent the trial court authorized expenditure of up to $1,500.00 for consultation with appellant's designated forensic pathologist.

*Appellant's Trial Testimony*

{¶46} Appellant testified on his own behalf at trial.[3]

{¶47} His testimony began with the Kids America incident. Appellant said Gadfield and Cooper were fighting initially, perhaps playing around, but they were wrestling on the ground. Appellant got into an argument with Gadfield and it was Gadfield who asked if appellant wanted to take it outside. Appellant testified he said yes even though he didn't really want to fight. Appellant said Gadfield unexpectedly punched him in the face, then grabbed him by the legs and took him to the ground. Gadfield was on top of appellant and he couldn't get up. Cooper, too, was yelling at Gadfield and telling him to get off appellant. Eventually, Gadfield jumped up and ran to the front of the facility. Appellant followed him out to the front and spoke to the manager to request paper towels for his bloody lip. Appellant testified he did not have a knife at Kids America because he didn't work that day and he only carried the knife when he worked. Appellant denied making the statements Cooper testified to and testified he never said he intended to "kill that [expletive]." Due to Gadfield striking him, appellant had a busted lip and he was covered in blood.

{¶48} Appellant also testified he went to the hospital for a torn meniscus resulting from the Kids America fight, although he told hospital staff the injury was from basketball.

{¶49} Appellant testified he knew Gadfield from around town as a fighter because he saw some of Gadfield's fights on video. He described Gadfield's signature move as

---

[3] Appellant also called one other defense witness, Kyle Stubbs, a coworker from K.F.C. Stubbs testified he was present during the conversation between appellant and Skyler McCoy about the Kids America incident. Stubbs testified appellant was laughing about the fight and did not threaten Gadfield. He also said Emily Finton was not present for the entire conversation because she entered the restaurant at one point and the conversation took place in the parking lot.

picking up an opponent, slamming him to the ground, laying on top of him, and punching him. Appellant said he knew Gadfield put an opponent in the hospital after kneeing him in the face.

{¶50} Appellant's account of the conversation at K.F.C. included his claim that he told Skyler McCoy, Gadfield's best friend, about his plans with his girlfriend that Friday night. He said he discussed the Kids America episode with McCoy but they didn't argue about it and appellant did not threaten Gadfield during the conversation. Appellant and McCoy exchanged phone numbers.

{¶51} Appellant also denied threatening Gadfield to Cooper over Facebook.

{¶52} Appellant's account of that Friday evening began with him and his girlfriend getting haircuts and buying new clothes to wear to the comedy club. They had a few drinks and went to the Cedar Street Inn around 10:30 with appellant's co-worker.

{¶53} Appellant left the bar to go to his girlfriend's car to get a cigar. He was returning to the bar with his phone in his hand when he saw Gadfield running toward him between cars in the parking lot. He didn't know Gadfield and McCoy were at the bar until the confrontation in the parking lot and he feared for his life. Gadfield swung at appellant but only grazed him and then "went to [his] legs." Appellant acknowledged he told Bryant he hit Gadfield first during the fight but testified the first contact was actually the "glancing blow" by Gadfield.

{¶54} Appellant fell and Gadfield was on top of him pinning his arms.

{¶55} Appellant heard girls yelling to stop the fight. Gadfield was on top of him punching him in the face repeatedly. Gadfield then got up; appellant got up and went inside the bar to get his girlfriend and tell her it was time to leave because "it happened

again." When he came out of the bar, he saw Gadfield pulling his shirt off and saw blood on him. Appellant went to his girlfriend's car and got in because people were coming after him and pounding on the car. Appellant then got out of the car and waited for deputies to arrive. He didn't realize his leg was cut until he was at the jail and was then transported to the hospital.

{¶56} Appellant testified he was scared when he saw Gadfield running at him because he has seen Gadfield fight. Gadfield was on top of appellant the entire time until they both got up. He testified he has no recollection of stabbing Gadfield and was shocked to discover he had done so. He doesn't remember having the knife in his hand and doesn't know how it opened because it requires two hands to open. He does not remember putting the knife in the car after the fight.

{¶57} Upon cross examination, however, appellant admitted he took the knife out to get Gadfield off him because he feared for his life. (T. 1024).

{¶58} Appellant again moved for judgment of acquittal at the close of all of the evidence; the motion was overruled. Appellant was found guilty as charged.

{¶59} The trial court found Counts I and II to be allied offenses of similar import and appellee elected to sentence upon Count I, felony murder. The trial court imposed a prison term of 15 years to life.

{¶60} Appellant now appeals from the judgment entry of his convictions and sentence.

{¶61} Appellant raises six assignments of error:

**ASSIGNMENTS OF ERROR**

{¶62} "I.  THE TRIAL COURT ERRED BY PERMITTING A POLICE OFFICER TO TESTIFY AS TO FACTS BASED ON INADMISSIBLE HEARSAY, AND AS TO OPINIONS WITHOUT PERSONAL KNOWLEDGE OF THE UNDERLYING FACTS OR EXPERT QUALIFICATION.  [ ]."

{¶63} "II.  THE TRIAL COURT VIOLATED VINCENT MOORE'S RIGHT TO DUE PROCESS AND A FAIR TRIAL WHEN IT ENTERED JUDGMENTS OF CONVICTION FOR FELONY MURDER AND FELONIOUS ASSAULT AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. [ ]."

{¶64} "III.  VINCENT C. MOORE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL BECAUSE HIS ATTORNEYS FAILED TO REQUEST INSTRUCTIONS FOR VOLUNTARY MANSLAUGHTER, INVOLUNTARY MANSLAUGHTER, AND AGGRAVATED ASSAULT, AND FAILED TO DISCLOSE MOORE'S WITNESSES IN TIME TO PRESENT THEM AT TRIAL, IN VIOLATION OF MOORE'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION; ARTICLE I, SECTIONS 1 AND 10, OF THE OHIO CONSTITUTION; [ ]."

{¶65} "IV.  THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT FAILED TO PROVIDE JURY INSTRUCTIONS ON VOLUNTARY MANSLAUGHTER, INVOLUNTARY MANSLAUGHTER, AND AGGRAVATED ASSAULT, IN VIOLATION OF MOORE'S RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATE CONSTITUTION AND ARTICLE I, SECTION 16, OF THE OHIO CONSTITUTION.  [ ]."

{¶66} "V.  THE TRIAL COURT COMMITTED ABUSED (*sic*) ITS DISCRETION WHEN IT REFUSED TO PROVIDE MOORE WITH FUNDING FOR A PSYCHOLOGIST AND FORENSIC INVESTIGATOR, IN VIOLATION OF MOORE'S RIGHT TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.  [ ]."

{¶67} "VI.   THE CUMULATIVE EFFECTS OF MOORE'S FIRST FIVE ASSIGNMENTS OF ERROR DENIED HIM A FAIR TRIAL.  [ ]."

## ANALYSIS

### I.

{¶68} In his first assignment of error, appellant argues the trial court should not have permitted introduction of testimony of Detective Garrison Bryant that he characterizes as hearsay and opinion testimony without personal knowledge or expert qualification.  We disagree.

{¶69} Appellant first challenges appellee's introduction of the videotape of Bryant's interview of appellant.  Before trial, appellant objected to admission of the videotape because of "hearsay" statements throughout the interview regarding what Bryant learned from other witnesses.  Appellant did not renew the objection during trial when the tape was played.  In *State v. Pyo,* 5th Dist. Delaware No. 04CAA01009, 2004–Ohio–4768, at ¶ 19, we explained: "In general, the ruling on a motion *in limine* does not preserve the record on appeal and an appellate court need not review the ruling unless the claimed error is preserved by an objection at trial." *State v. Grubb,* 28 Ohio St.3d 199, 503 N.E.2d 142 (1986), paragraph two of the syllabus, citing, e.g., *State v. Leslie,* 14 Ohio

App.3d 343, 344, 471 N.E.2d 503 (2nd Dist.1984). Appellant did not properly preserve the error for appellate review by objecting to introduction of the videotape at trial. We therefore review admission of the videotape for plain error.

{¶70} A plain-error analysis pursuant to Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Notice of plain error is to be taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. *State v. Granderson*, 177 Ohio App.3d 424, 2008-Ohio-3757, 894 N.E.2d 1290 (5th Dist.), ¶ 63, citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus; *State v. Cooperrider*, 4 Ohio St.3d 226, 227, 448 N.E.2d 452 (1983).

*"Hearsay" Statements during Interview*

{¶71} During the interview, Bryant tells appellant what he has "heard" about the fight at Kids America and asks appellant for his version of events. Prompting appellant, Bryant variously tells appellant he has heard appellant threatened to kill the victim; appellant pulled a knife at Kids America; Cooper provided a written statement at Kids America; Gadfield was a good fighter; and appellant had a closed knife at Kids America.

{¶72} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). An out-of-court statement is improper hearsay if it is offered for the truth of the matter asserted. *State v. Parker,* 2nd Dist. Montgomery No. 18926, 2002-Ohio-3920, ¶ 50. From our review of the record, we agree with appellee's assertion that Bryant's statements on the videotape regarding other witnesses' statements were not offered at trial for the truth of the matter asserted.

{¶73} Appellant cites *State v. Kemper,* 2nd Dist. Clark Nos. 2002-CA-101 and 2002-CA-102, 2004-Ohio-6055, as authority for his assertion that "the court of appeals reversed because the police referenced inculpatory hearsay while questioning the defendant." A reading of *Kemper* reveals, however, that the Court of Appeals reversed on the basis of ineffective assistance of counsel because no objection was raised to the statements and because it was such a close case, the statements affected the outcome. Id. at ¶ 37. The circumstances of *Kemper* are not analogous to the circumstances here. In *Kemper*, defense trial counsel failed to object to admission of the defendant's videotaped interview in which a detective stated several witnesses identified the defendant as the shooter. The key issue was the identity of the shooter, and the defendant denied he was the shooter. Id. Here, the basic facts of the Kids America incident and the Cedar Street Inn stabbing were not at issue, although appellant's thoughts and motivations were.

{¶74} We agree with appellee that Bryant's statements on the videotape were admissible for a fundamental reason: the statements are not hearsay because they were not introduced for the purpose of proving the truth of the matters asserted therein. *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 117, reconsideration denied*,* 140 Ohio St.3d 1455, 2014-Ohio-4414, 17 N.E.3d 600, and cert. denied*,* 135 S.Ct. 1562, 191 L.Ed.2d 649 (2015) ["statement that D made a statement to X is not subject to attack as hearsay when its purpose is to establish the state of mind thereby induced in X, such as * * * having knowledge or motive * * *"]. A statement is not hearsay when offered for a purpose other than to prove the truth of the matter asserted. *State v. Davis,* 62 Ohio St.3d 326, 343, 581 N.E.2d 1362 (1991). Here, appellee did not use

Bryant's statements to establish the truth of what various witnesses told him about the two incidents, but for the non-hearsay purpose of establishing appellant's motive in killing Gadfield.  See *Osie*, supra.

{¶75} The issue at trial was not whether appellant was armed with a knife during the Kids America confrontation, but whether the fight with Gadfield gave appellant reason to seek an opportunity for revenge for Gadfield's alleged sucker-punch. Bryant told appellant what he heard of the earlier incident to draw out appellant's version of events. The statements also explained the steps taken in Bryant's investigation.  See, *State v. Tanner*, 5th Dist. Muskingum No. CT2003-0005, 2003-Ohio-6866, ¶12 [officer's testimony regarding what he was told by a witness was not offered to prove the truth of the matter asserted and explained the steps taken in the officer's investigation, especially when the witness herself testified and her testimony was the same]; *State v. Bound*, 5th Dist. Guernsey No. 03 CA 21, 2004-Ohio-6530, ¶ 34 [information officer discovered as a result of his conversation with witness was merely part of his criminal investigation and not hearsay].

{¶76} *Kemper*'s determination that admission of the videotape rose to the level of plain error is supported by two elements that are distinguishable from the instant case. *Kemper* finds the underlying problem with admission of the videotape in that case to be a violation of the Confrontation Clause.  Id. at ¶ 35. "The court [noted], however, that 'when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior (hearsay) statements. The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *Kemper*, 2004-Ohio-6055 at ¶ 36, citing *State v. Marbury,* 2nd Dist.

Montgomery No. 19226, 2004-Ohio-1817, ¶ 38.  In the instant case, Bryant testified and was subject to cross examination, as were the Kids America witnesses he spoke of during the interview, K'Marr Cooper and the Kids America manager.  *Kemper*'s underlying Confrontation Clause issue is absent here.   Even if the admission of appellant's videotaped statement and related testimony constituted a hearsay violation, "[t]he admission of hearsay does not violate the Confrontation Clause if the declarant testifies at trial." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 64, citing *California v. Green,* 399 U.S. 149, 155, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *State v. Keenan,* 81 Ohio St.3d 133, 142, 689 N.E.2d 929 (1998).

{¶77} The plain-error question further distinguishes the instant case from *Kemper*. Even if the admission of the videotaped statement was non-constitutional error, it "is harmless if there is substantial other evidence to support the guilty verdict." *Powell*, supra, 2012-Ohio-2577 at ¶ 64, citing *State v. Webb,* 70 Ohio St.3d 325, 335, 638 N.E.2d 1023 (1994); Crim.R. 52(A).  *Kemper* was "a close case, as evidenced by the initial trial ending in a hung jury, and in view of the egregious nature of the hearsay that was admitted against Kemper, it is a nice question whether its admission rises to the level of plain error." Id., 2004-Ohio-6055 at ¶ 37.  The *c*ourt did not reach the issue of plain error, however, concluding instead the failure of Kemper's trial counsel to have objected to this evidence rose to the level of ineffective assistance of trial counsel and required reversal of the conviction.  Id. at ¶ 37.

{¶78} The instant case is not a close one.  We find admission of the videotape does not rise to the level of plain error because the outcome of the trial would not have been different absent its admission.  Plain error or defect under Crim.R. 52(B) does not

occur unless, but for the error, the outcome of the trial clearly would have been otherwise. *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. The fact that appellant stabbed Gadfield and caused his death is not in question because other properly-admitted evidence provided overwhelming evidence of appellant's guilt. See, *Powell*, supra, 2012-Ohio-2577 at ¶ 65.

*Bryant's Alleged "Expert" Testimony*

{¶79} Appellant next argues the trial court erred in admitting Bryant's testimony when Bryant testified as an unqualified expert about appellant's mental state.

{¶80} Bryant testified about what he learned from witnesses to the Kids America fight. Appellant objected on the basis of hearsay and the trial court noted appellant made statements against interest that are not hearsay. Bryant further testified, based upon his investigation, as to his opinion of what occurred at Kids America: Cooper and appellant played basketball, Gadfield arrived after the game ended, Gadfield and appellant got into a verbal dispute, Gadfield struck appellant in the mouth, both went to the ground, Gadfield pinned appellant, appellant pulled a knife on him, and Gadfield jumped up and ran to the front of the facility where the employees were stationed. In Bryant's estimation, Gadfield's striking of appellant was not an ambush or a "sucker punch;" the two were fighting back and forth. Bryant acknowledged there was no physical evidence appellant had a knife during the confrontation. Bryant also testified based upon his investigation that appellant was not afraid of Gadfield, the Kids America incident provided the motive for appellant to later stab Gadfield, and appellant intended to stab Gadfield.

{¶81} Bryant was not qualified as an expert witness and did not testify as an expert. "If the witness is not testifying as an expert, the witness' testimony in the form of

opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Ohio Evid. R. 701. Lay opinion, inferences, impressions or conclusions are therefore admissible if they are those that a rational person would form on the basis of the observed facts and if they assist the jury in understanding the testimony or delineating a fact in issue. *State v. Harper*, 5th Dist. Licking No. 07 CA 151, 2008-Ohio-6926, ¶ 37, citing *State v. Kehoe*, 133 Ohio App.3d 591, 603, 729 N.E.2d 431 (12th Dist.1999). Evid.R. 701 affords the trial court considerable discretion in controlling the opinion testimony of lay witnesses. Id., citing *City of Urbana ex rel. Newlin v. Downing*, 43 Ohio St.3d 109, 113, 539 N.E.2d 140 (1989) and *Kehoe,* supra, at 603.

{¶82} Each of Bryant's challenged statements is based directly upon what he learned in the course of his investigation. The evidence appellant cites of his mental state came from appellant's own statements to Bryant and the detective offered no expert opinion on appellant's mental state. Bryant testified to his extensive training and experience in criminal investigation in general and to the steps taken in this investigation in particular. His testimony regarding the Kids America incident was helpful to the trier of fact in determining appellant's motive for the confrontation at the Cedar Street Inn. Bryant's opinion testimony was rationally based upon his investigation into the underlying incident. Bryant's testimony meets the requirements of Evid.R. 701.

{¶83} Appellant's first assignment of error is overruled.

II., III., IV.

{¶84} Appellant's second, third, and fourth assignments of error are related because each argument is premised at least in part upon appellant's assertion the trial court should have instructed the jury upon the offenses of voluntary manslaughter, involuntary manslaughter, and aggravated assault because the evidence at trial better supported those offenses.  We reject appellant's premise that such instructions were necessary or appropriate and will address each assignment of error in this context.

{¶85} Appellant asserts he acted in response to serious provocation by Gadfield because Gadfield "was a trained fighter who had attacked Moore twice."  (Brief, 13).  We have thoroughly reviewed the record and find it does not support appellant's self-serving characterization of the confrontations with Gadfield.

{¶86} Appellant was found guilty upon one count of felony murder pursuant to R.C. 2903.02(B), which states, "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."  The underlying offense is felonious assault pursuant to R.C. 2903.11(A)(2), which states: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

{¶87} Appellant asserted the affirmative defense of self-defense and the jury was instructed thereupon. The trial court's instruction to the jury upon self-defense explained in pertinent part, "To establish a claim of self-defense, the defendant must prove by the greater weight of the evidence that he was not at fault in creating the situation giving rise

to the event in which death occurred; and that he had reasonable grounds to believe and an honest belief, even if mistaken, that he was in immediate danger of death or great bodily harm and that his only means of retreat from such danger was the use of deadly force; and he had not violated a duty to retreat to avoid the danger." See, *State v. Petrone,* 5th Dist. Stark No. 2011CA00067, 2012–Ohio–911, citing *State v. Robbins,* 58 Ohio St.2d 74, 80, 388 N.E.2d 755 (1979).

*Appellant's Jury Instructions Argued on Appeal but not at Trial*

{¶88} Appellant asserts the jury should have been instructed upon voluntary manslaughter pursuant to R.C. 2903.03(A);[4] aggravated assault pursuant to R.C. 2903.12;[5] and involuntary manslaughter pursuant to R.C. 2903.04.[6] Appellant did not request these instructions at trial. Key to appellant's arguments is his premise that "[t]his case involves textbook provocation." (Brief, 15).

{¶89} Where the testimony and evidence adduced at trial provides a sufficient basis to believe that a defendant acted under serious provocation, "an instruction on aggravated assault must be given to the jury." *State v. Deem,* 40 Ohio St.3d 205, 533 N.E.2d 294 (1988), paragraph four of the syllabus. To have warranted an aggravated

---

[4] R.C. 2903.03(A), voluntary manslaughter, states, "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *."

[5] R.C. 2903.12(A), aggravated assault, states, "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly: (1) Cause serious physical harm to another or to another's unborn; (2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code."

[6] R.C. 2903.04(A), involuntary manslaughter, states, "No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony."

assault instruction in the present case, there must be serious provocation. "[P]rovocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force." Id. at paragraph five of the syllabus. Further, "[i]n determining whether the provocation was reasonably sufficient to incite the defendant into using deadly force, the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time." Id. See also, *State v. Mack,* 82 Ohio St.3d 198, 200, 694 N.E.2d 1328 (1998).

{¶90} Similarly, in order to warrant an instruction on voluntary manslaughter, a defendant must present sufficient evidence of serious provocation such that a jury could reasonably acquit the defendant of murder and convict the defendant of voluntary manslaughter. *State v. Newell*, 5th Dist. Licking No. 2004CA00021, 2004-Ohio-6261, ¶ 14, citing *State v. Shane*, 63 Ohio St.3d 630, 637, 590 N.E.2d 212 (1992); *State v. Wilkins*, 64 Ohio St.2d 382, 388, 415 N.E.2d 303 (1980). The defendant must show that he was under the influence of sudden passion or in a sudden fit of rage which was brought about by provocation that was "sufficient to arouse the passions of an ordinary person beyond the power of his or her control." Id., citing *Shane,* supra. "However, past incidents or verbal threats do not satisfy the test for reasonably sufficient provocation when there is sufficient time for cooling off." Id., citing *State v. Mack*, 82 Ohio St.3d 198, 201, 1998-Ohio-375, 694 N.E.2d 1328 and *State v. Huertas*, 51 Ohio St.3d 22, 31-32, 553 N.E.2d 1058 (1990); *State v. Pierce*, 64 Ohio St.2d 281, 414 N.E.2d 1038 (1980).

{¶91} "Even though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is required only where the

evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 133, citing *State v. Thomas,* 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus. In making this determination, the court must view the evidence in a light most favorable to defendant. Id., 2006-Ohio-791 at ¶ 34, citing *State v. Smith*, 89 Ohio St.3d 323, 331, 731 N.E.2d 645 (2000) and *State v. Wilkins*, 64 Ohio St.2d 382, 388, 18 O.O.3d 528, 415 N.E.2d 303 (1980). Nevertheless, an instruction is not warranted every time any evidence is presented on a lesser included offense. There must be "sufficient evidence" to "allow a jury to *reasonably* reject the greater offense and find the defendant guilty on a lesser included (or inferior-degree) offense." (Emphasis sic.) Id., citing *State v. Shane,* 63 Ohio St.3d at 632–633, 590 N.E.2d 272.

{¶92} If insufficient evidence of provocation is presented such that no reasonable jury would decide the actor was reasonably provoked by the victim, the trial judge must, as a matter of law, refuse to give a voluntary manslaughter instruction. *State v. Shane*, 63 Ohio St.3d 630, 634, 590 N.E.2d 272 (1992).

*Provocation not a Factor*

{¶93} We note appellant's theory of the case at trial is inconsistent with his theory here. At trial, he argued self-defense; now he argues he was provoked into killing Gadfield. We have observed "[i]n most cases, an aggravated assault instruction is incompatible with an instruction on self-defense, so that both cannot be given together." *State v. Owens*, 5th Dist. Richland No. 2004-CA-87, 2005-Ohio-4402, ¶ 31, citing *State v. Beaver*, 119 Ohio App.3d 385, 397, 695 N.E.2d 332 (11th Dist.1997). However, an

aggravated assault instruction could be given in a self-defense case, where circumstances are such that the defendant exceeded the amount of force necessary for his defense, out of passion or rage. Id.

{¶94} We ultimately find insufficient evidence of provocation. Appellant argues the serious provocation in this case is Gadfield, a trained fighter, started two fights with him: at Kids America and at the Cedar Street Inn. There is some evidence in the record Gadfield was a "trained fighter" because Cooper testified he trained with Gadfield at a boxing gym and Gadfield had an upcoming amateur bout. However, based upon appellant's recorded interview, there is no evidence Gadfield's status as an amateur boxer played any role in appellant's actions during either incident. He told police the day after the stabbing that he disliked Gadfield because he had a reputation for "sneak[ing] up on people," not that he was afraid of him because of any fearsome reputation as a boxer (T. 256-257). Evident in the interview is appellant's dislike of and disdain for Gadfield, not any fear of him:

* * * *.

[Bryant:] Could have you or did you like put your hand in your pocket and open the blade in case he would do anything? I mean, and not bring the knife out—I'm not saying that.

[Appellant:] No. I wanted to fight him. I really wanted to fight him. Because I already knew he didn't have no chance to fight me. I wanted to fight him.

[Bryant:] Okay.

[Appellant:] That's why he went to my legs, and that's how we ended up on the ground.

[Bryant:] Okay.

[Appellant:] I only hit him a couple times.

[Bryant:] Where did he hit you at?

[Appellant:] The mouth.

[Bryant:] Again?

[Appellant:] Yeah. The same spot but at the bottom.

[Bryant:] Okay.

[Appellant:] When he hit me in the top, like I said, it caught me offguard. My mouth was open, and my tooth went into my mouth.

[Bryant:] Okay.

[Appellant:] So, I mean, every day I had to listen to my girlfriend talk shit about, you know what I mean, me getting hit in the mouth. It just made me mad every day, just like seeing my mouth. I had to go to work with a swollen mouth, wake up in the morning put ice on my mouth, go to bed and put ice on my mouth. It was just too much.

* * * *.

[Appellant:] Like I couldn't believe he did it because it's never happened to me.

[Bryant:] You guys used to be friends, right?

[Appellant:]  I was never friends with this kid.

[Bryant:]  Never friends with him?

[Appellant:]  I always knew who he was because how he is. He is a cocky little fucker.  That's how he is, talk shit to everybody. He wants to fight whoever, but he won't fight them.  He will go from behind, and he will sneak up because that's how he is.  I have seen him do it.  I have watched him.  That's why I have never been friends with him.

[Bryant:]  Okay.

[Appellant:]  I know how he is.

[Bryant:]  So you guys are coming through.  And he hits you first or you hit him?  Who hits who first?

[Appellant:]  He tried to swing at me.  I hit him first though.  I know I hit him first.

[Bryant:]  Okay.  Where did you hit him at?

[Appellant:]  Somewhere in the right side of his face.  I was— man, I was a little tipsy.

[Bryant:]  His right side?

[Appellant:]  His left side.

[Bryant:]  Okay.

[Appellant:]  I swung with my right.

[Bryant:]  Okay.

[Appellant:]  So, and that's when he—he hit me in the mouth, and then that was it.

* * * *.

T. 282-285.

{¶95} We reject appellant's suggestion of provocation.  "[P]rovocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force." *State v. Deem,* 40 Ohio St.3d 205, 533 N.E.2d 294 (1988)*,* paragraph five of the syllabus. Further, "[i]n determining whether the provocation was reasonably sufficient to incite the defendant into using deadly force, the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him **at the time**." Id. (emphasis added.) See also, *State v. Mack,* 82 Ohio St.3d 198, 200, 694 N.E.2d 1328 (1998).  Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage. *State v. Mack*, 82 Ohio St.3d 198, 201, 694 N.E.2d 1328 (1998).

{¶96} "[P]ast incidents or verbal threats do not satisfy the test for reasonably sufficient provocation when there is sufficient time for cooling off." *State v. Mack*, 82 Ohio St.3d 198, 201, 1998-Ohio-375, 694 N.E.2d 1328, citing *State v. Huertas*, 51 Ohio St.3d 22, 31-32, 553 N.E.2d 1058 (1990) and *State v. Pierce*, 64 Ohio St.2d 281, 414 N.E.2d 1038 (1980).  In this case, the Kids America incident does not weigh in provocation because there was considerable time for "cooling off" between the incident at Kids America and the fight at the Cedar Street Inn.  At the bar, there is no evidence appellant was under the influence of sudden passion or a fit of rage—in fact, at trial appellant

wanted the finder of fact to believe he was terrified. The mutual fight at the Cedar Street Inn, standing alone, does not constitute serious provocation.

{¶97} Appellant's testimony that he stabbed Gadfield because he was in fear supports an instruction on self-defense, which is incompatible with appellant's claim that he pulled the knife out of a sudden passion or in a sudden fit of rage brought on by serious provocation occasioned by the victim. *State v. Krug*, 11th Dist. Lake No. 2008-L-085, 2009-Ohio-3815, ¶ 87.

{¶98} This case does not present sufficient evidence of serious provocation such that the jury could reasonably acquit appellant of murder and convict him instead of voluntary manslaughter, aggravated assault, or involuntary manslaughter. We find jury instructions upon those offenses were not warranted. Based in part upon this finding, we will address each of appellant's assignments of error in turn.

*Appellant's Convictions not against Manifest Weight of the Evidence*

{¶99} In his second assignment of error, appellant argues his convictions upon one count of felony murder and one count of felonious assault are against the manifest weight of the evidence because while he may be guilty of voluntary manslaughter or involuntary manslaughter, neither of those offenses may form the predicate offense for felony murder. We disagree with appellant's framing of the issue.

{¶100}      In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the

conviction must be overturned and a new trial ordered." *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." Id.

{¶101}     Appellant essentially argues the jury lost its way because he should have been convicted of voluntary manslaughter, aggravated assault, or involuntary manslaughter, but the jury did not have those options before it and we have already concluded those findings are not warranted by the evidence.  We disagree with appellant's reading of the felony murder statute and note he has provided no support for his argument, case law or otherwise.  In our review of whether the manifest weight of the evidence the issue properly raised posed by the assignment of error is whether upon our review of the entire record, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered.

{¶102}     This is not the exceptional case in which the evidence weighs heavily against the convictions.  Appellant admitted stabbing Gadfield during the fight at the Cedar Street Inn.  The evidence of the eyewitnesses' supports that this was a mutual fight that appellant exacerbated with the use of a knife.

{¶103}     We further note under the felony murder statute a defendant may be found guilty of murder even if he did not "intend" to cause the victim's death. *State v. Miller,* 96 Ohio St.3d 384, 775 N.E.2d 498, 2002–Ohio–4931, ¶¶ 31–34. The critical issue is whether the defendant had the requisite culpable mental state to support a conviction for the underlying felony offense. Id. See, also, *State v. Berry,* 8th Dist. Cuyahoga No.

83756, 2004–Ohio–5485, at ¶ 35, citing *State v. Irwin,* 4th Dist. Hocking Nos. 03CA13 & 03CA14, 2004–Ohio–1129.

{¶104} Felonious assault is the underlying offense supporting the felony murder charge in this case. To sustain a conviction for felony murder, appellee had to prove appellant "knowingly" caused physical harm to Gadfield with a deadly weapon. As the Ohio Supreme Court explained in *Miller,* supra, "a person acts *knowingly, regardless of purpose,* when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." *Miller,* supra, 2002–Ohio–4931 at ¶ 31.

{¶105} The evidence showed Gadfield sustained a knife wound approximately one and a quarter inches deep that penetrated his skin, muscles, and ribs and entered his heart. Appellant admitted he pulled the knife intending to graze Gadfield with it to get him off of him. From the surrounding circumstances, reasonable minds could conclude appellant attempted to cause harm to Gadfield and "[i]t may be reasonably inferred that [appellant], by holding the knife in his hand, was ready to use it." *State v. Workman*, 84 Ohio App.3d 534, 537, 617 N.E.2d 723, 726 (9th Dist.1992). See also, *State v. Stewart*, 5th Dist. Stark No. 2001CA00033, 2002-Ohio-1833; *State v. Glossip*, 12th Dist. Butler No. CA90-07-138, 1991 WL 35869, *2 (Mar. 18, 1991); *State v. Simmons*, 9th Dist. Lorain No. 90CA004949, 1991 WL 172917, *2 (Sept. 4, 1991); *State v. Hill*, 1st Dist. Hamilton No. C-010176, 2002-Ohio-1906; *State v. Turner*, 11th Dist. Ashtabula No. 2010-A-0060, 2011-Ohio-5098, ¶ 66; *State v. Murphy*, 2nd Dist. Clark No. 05-CA-71, 2007-Ohio-1747, ¶ 9.

{¶106} The jury found defendant guilty of murder as a proximate result of felonious assault. Engaging in the limited weighing of the evidence we are permitted, we

cannot say the jury clearly lost its way and created such a manifest miscarriage of justice that appellant's convictions must be reversed. The jury heard and saw all the evidence, including appellant's own testimony. The jury was in the best position to weigh the credibility of witnesses, especially the credibility of appellant, and they chose, as they may, not to believe appellant's self-defense theory. "The jury did not lose its way simply because it chose to believe appellee's version of the events, which it had a right to do." *State v. Morten,* 2d Dist. No. 23103, 2010-Ohio-117, ¶ 28.

{¶107}    The nature of the wound and weapon, appellant's own statements that he wanted to cut Gadfield, and the remaining evidence concerning circumstances preceding the stabbing, provided the jury with sufficient, competent, and credible evidence on which to find guilt beyond a reasonable doubt.

*Appellant did not receive Ineffective Assistance of Counsel*

{¶108}    In appellant's third assignment of error, he asserts he received ineffective assistance of counsel because defense trial counsel did not request jury instructions for voluntary manslaughter, involuntary manslaughter, and aggravated assault, and failed to disclose defense witnesses in time to present them at trial. We disagree.

{¶109}    To succeed on a claim of ineffectiveness, a defendant must satisfy a two-prong test. Initially, a defendant must show that trial counsel acted incompetently. *See, Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). In assessing such claims, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be

considered sound trial strategy.'" *Id.* at 689, citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158 (1955).

{¶110}    "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689. The question is whether counsel acted "outside the wide range of professionally competent assistance." *Id.* at 690.

{¶111}    Even if a defendant shows that counsel was incompetent, the defendant must then satisfy the second prong of the *Strickland* test. Under this "actual prejudice" prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

{¶112}    The Ohio Supreme Court has recognized that "[f]ailure to request instructions on lesser-included offenses is a matter of trial strategy and does not establish ineffective assistance of counsel." *State v. Dillon*, 5th Dist. Muskingum No. 2008-CA-37, 2009-Ohio-3134, ¶ 119, citing *State v. Griffie*, 74 Ohio St.3d 332, 333, 658 N.E.2d 764 (1996). In light of our finding that instructions on the lesser-included offenses were not warranted, we do not consider counsel ineffective in this regard.

{¶113}    Appellant argues trial counsel was ineffective in failing to request jury instructions on voluntary manslaughter, aggravated assault, and involuntary manslaughter,  but as we discussed supra, there was no evidence presented at trial that would have required the trial court to give instructions on those offenses. Further, appellant has not demonstrated defense trial counsel's decision not to request those jury instructions was not valid trial strategy. As we noted supra, the provocation argument is

inconsistent with appellant's self-defense argument at trial. If the jury had believed appellant's self-defense argument, he would have had a complete defense and considerations of provocation would have made that outcome less likely. Again, a defendant is not denied effective assistance of counsel when defense counsel chooses, for strategic reasons, not to pursue every possible trial tactic. *Brown,* supra*;* see, *State v. Warthman*, 5th Dist. Perry No. 00-CA-11, 2001 WL 575163, *3 (May 18, 2001). Where the evidence does not support the instruction, defense counsel's failure to request such instruction does not fall below the standard of reasonableness and appellant is unable to satisfy the first prong of Strickland. *State v. Daviduk*, 5th Dist. Stark No. 2001 CA 00340, 2002-Ohio-773, *2.

{¶114}     Appellant also asserts counsel was ineffective in failing to provide the report of Kent Harshberger to appellee in accordance to rules of criminal discovery and in failing to disclose the victim's mother Pamela Gadfield as a potential defense witness in time to call her as a witness. While appellant's trial counsel may have erred in failing to comply with rules of criminal procedure, appellant has made no attempt to demonstrate how the result of the proceeding would have been different if either witness had testified. We thus find no evidence appellant was prejudiced by trial counsel's error.

{¶115}     Appellant did not receive ineffective assistance of trial counsel.

*The Trial Court did not commit Plain Error*

{¶116}     In his fourth assignment of error, appellant argues the trial court committed plain error in failing to instruct the jury upon voluntary manslaughter, involuntary manslaughter, and aggravated assault. We disagree.

Jury instructions are within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Martens*, 90 Ohio App.3d 338, 344, 629 N.E.2d 462 (3rd Dist.1993). In order to find an abuse of discretion, the reviewing court must determine that the trial court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). Crim.R. 30(A) governs instructions and states a party may file written requests that the court instruct the jury on the law as set forth in the requests, and on appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict.

Appellant concedes no objection to the jury instructions was raised at trial. Accordingly, our review of the alleged error must proceed under the plain error rule of Crim. R. 52(B), which states: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." An alleged error "does not constitute a plain error ... unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus.

{¶117}     Appellant bears the burden of demonstrating that a plain error affected his substantial rights. *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770 (1993); *State v. Perry*, 101 Ohio St.3d 118, 120, 120 802 N.E.2d 643 (2004). Even if the defendant satisfies this burden, an appellate court has discretion to disregard the error and should correct it only to "prevent a manifest miscarriage of justice." *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

{¶118} "In reviewing a record to ascertain the presence of sufficient evidence to support the giving of an * * * instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction." *State v. Dillon*, 5th Dist. Muskingum No. 2008-CA-37, 2009-Ohio-3134, ¶ 88, citing *Feterle v. Huettner*, 28 Ohio St.2d 54, 275 N.E.2d 340 (1971), at syllabus and *State v. Horton,* Stark App. No.2007-CA-00085, 2007-Ohio-6469, ¶ 77.

{¶119} In light of our finding that the argued instructions were not warranted by the evidence, the trial court's failure to give the instructions was not plain error. Appellant cannot demonstrate the result of the trial would have been different if the instructions were given.

{¶120} Appellant's second, third, and fourth assignments of error are overruled.

V.

{¶121} In his fifth assignment of error, appellant argues the trial court erred in refusing to provide funds for a psychologist and forensic investigator. We disagree.

{¶122} The decision to grant funds for expert assistance to indigent defendants is left to the sound discretion of the trial court. *State v. Bays*, 5th Dist. Ashland No. 13-COA-005, 2013-Ohio-4177, ¶16, citing *State v. Mason,* 82 Ohio St.3d 144, 150, 1998–Ohio–370, 694 N.E.2d 932. As a matter of due process, indigent defendants are entitled to receive the "raw materials" and the "basic tools of an adequate defense." *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). "While *Ake* involved the provision of expert psychiatric assistance only, the case now is generally recognized

to support the proposition that due process may require that a criminal defendant be provided other types of expert assistance when necessary to present an adequate defense." *Mason,* supra, 82 Ohio St.3d at 149. In accordance with the United States Supreme Court's decision in *Ake,* the *Mason* Court held:

> [D]ue process, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution, requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of a sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial. Id*.*
>
> *State v. Mason,* 82 Ohio St.3d 144, 149, 1998–Ohio–370, 694 N.E.2d 932.

{¶123}    We review appellant's claim under an abuse of discretion standard. See *State v. Jones*, 90 Ohio St.3d 403, 414, 2000-Ohio-187, 739 N.E.2d 300. The term "abuse of discretion" connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore*, supra, 5 Ohio St.3d at 219.

{¶124}    Decisions as to the appointment of experts are to be made "in the sound discretion of the court" based upon "(1) the value of the expert assistance to the defendant's proper representation * * * and (2) the availability of alternative devices that

would fulfill the same functions." *State v. Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264 (1984), paragraph four of the syllabus. See, also, Sup.R. 20(IV)(D). This Court has previously held that "undeveloped assertions that the proposed assistance would be useful to the defense are patently inadequate." *In the matter of Kristopher F.,* 5th Dist. Stark No. 2006CA00312, 2007-Ohio-3259, ¶ 48. We have held "[i]n the absence of a particularized showing of need, due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution does not require the provision of an expert witness." *State v. Babcock*, 5th Dist. Stark No. 2011CA00286, 2012-Ohio-3627, ¶ 30, citing *In re B.L.,* 5th Dist. Licking No. 09-CA-54, 2009–Ohio–6341, ¶ 41.

{¶125}    In denying appellant's motion for appropriation of funds for a consulting defense psychologist, the trial court found an expert would not aid the jury in determining whether appellant had the mental state required for self-defense. Here, appellant argues Bryant was able to testify to appellant's mental state but he was not able to respond with explanation of the traumatic or stressful event of being "attacked" by Gadfield twice. Bryant's testimony was based upon appellant's statement to him that he intended to cut Gadfield to get him off of him. Appellant's claim that a psychologist would have somehow buttressed his argument for self-defense is speculative and does not establish the trial court abused its discretion. See, *State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081. The trial court was within its discretion to deny funds for a consulting psychological expert when only appellant's self-serving statements supported his claim of self-defense. See, *State v. Nichols*, 5th Dist. Fairfield No. 09-CA-50, 2010-Ohio-2242, ¶ 36.

{¶126}    Regarding appellant's request for funds for a defense investigator, appellant acknowledges the trial court did provide funds although not in the amount requested.  Appellant argues the trial court should have provided the $300/hour billed by an expert in bloodstain analysis and crime scene reconstruction but demonstrated no particularized need therefor.  The trial court did not abuse its discretion in providing a reasonable amount of funds for an investigator.  The facts of this case are not in issue and appellant's summary assertions that a bloodstain analysis or crime scene reconstruction could in any way aid his defense are insufficient to establish an abuse of discretion.

{¶127}    Appellant's fifth assignment of error is overruled.

VI.

{¶128}    In his sixth assignment of error, appellant argues the cumulative effects of his first five assignments of error denied him a fair trial.  We disagree.

{¶129}    In *State v. Garner,* 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995), the Ohio Supreme Court held pursuant to the cumulative error doctrine "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." Regarding appellant's arguments that we have already addressed supra, we do not find multiple instances of harmless error triggering the cumulative error doctrine. *State v. Scott,* 5th Dist. Richland No.11 CA80, 2012–Ohio3482, ¶ 75–76, appeal not allowed, 133 Ohio St.3d 1491, 2012–Ohio–5459, 978 N.E.2d 910.

{¶130}    Appellant's sixth assignment of error is overruled.

**CONCLUSION**

{¶131}     Appellant's six assignments of error are overruled and the judgment

of the Coshocton County Court of Common Pleas is affirmed.

By:  Delaney, J. and

Baldwin, J., concur.

Hoffman, P.J., concurring separately.

*Hoffman, P.J., concurring*

{¶132}     I concur in the majority's thorough and well-reasoned analysis and disposition of Appellant's second, third, fourth, fifth and sixth assignments of error.  I further concur with most of the majority's analysis and its disposition of Appellant's first assignment of error with the singular exception of its determination the trial court's admission of Bryant's "estimation" [opinion] that Gadfield's striking of Appellant was not an ambush or a sucker punch – was not a violation of Evid. R. 701.

{¶133}     Evid. Rule 701 allows a non-expert witness to testify as to his or her opinions or inferences which are rationally based on the perception of the witness **and** helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.  While I concede Bryant's testimony was helpful to the determination of a fact in issue (Appellant's motive for the confrontation at the Cedar Street Inn), I do not find it was rationally based on the perception of the witness.  I believe "perception of the witness" means the witness' first hand observation of an event or events.  Bryant's estimation/opinion of what happened at Kids America was not based upon his personal observation of the event.  I don't believe the rule allows a non-expert investigatory witness to speculate about an event not personally observed by that witness.  As such, I find the admission of Bryant's opinion in this regard to have been error.

{¶134}     However, I would find the error to be harmless in light of all the evidence.  Accordingly, I concur in the majority's decision to overrule Appellant's first assignment of error in its entirety.

_____
HON. WILLIAM B. HOFFMAN